# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 73217-0-I |
| | ) | |
| Respondent, | ) | (Consolidated with |
| | ) | No. 73216-1-I) |
| v. | ) | |
| | ) | PUBLISHED OPINION |
| DAWN MARIE SULLIVAN, | ) | |
| | ) | |
| Appellant. | ) | FILED: October 10, 2016 |
| | ) | |

LEACH, J. — Dawn Sullivan appeals her conviction for second degree assault. She challenges the trial court's refusal to excuse a juror who may have known the complaining witness and its decisions to give a first aggressor jury instruction and not to give a multiple assailants instruction. And she claims prosecutorial misconduct in closing argument to which she did not object. We reject each of these arguments. The record shows that the juror's possible acquaintance with a witness did not affect the juror's ability to be fair and impartial. The evidence at trial justified a first aggressor instruction. The trial court's self-defense instructions allowed Sullivan to argue her defense theory, and her multiple assailant instruction would have been cumulative. Finally, the prosecutor's remark in closing reflected a reasonable inference from Sullivan's testimony. Accordingly, we affirm Sullivan's conviction.

The State appeals Sullivan's sentence. It claims that the trial court had no authority to sentence her to a community program instead of confinement or to award credit for participation in that program toward her sentence. Because the Sentencing Reform Act of 1981[1] and the Supreme Court's decision in State v. Medina[2] prohibit the sentence the trial court imposed, we remand for resentencing.

## FACTS

Dawn Sullivan cut Christopher Bohannon on the arm with a kitchen knife during a quarrel in Bohannon's apartment. She had been staying there, off and on, for about a month while she looked for a new place to live. The night of the assault, Sullivan and Bohannon drank together at the apartment. After midnight, Sullivan left and walked to a nearby area of bars in downtown Seattle. She met Robert Cessill, a stranger, who was in town during a long layover and waiting at a bus stop. She invited Cessill back to Bohannon's apartment. The three talked, and Cessill and Bohannon drank, until Cessill fell asleep on the couch.

Sullivan asked to smoke some of Bohannon's medical marijuana. After he refused, the two began to argue. Sullivan, Bohannon, and Cessill later gave different accounts of what followed.

---

[1] Ch. 9.94A RCW.
[2] 180 Wn.2d 282, 324 P.3d 682 (2014).

According to Sullivan, Bohannon became furious and told her to leave. She tried to rouse Cessill because "it would be rude" to bring over a guest and then leave him there. Bohannon told her to let Cessill sleep. As she was shaking Cessill's foot, Bohannon "pounced" on her, and the two rolled on the floor. She did not see Cessill get off the couch, but she suddenly felt both men on top of her on the floor. She was afraid because "people were putting their hands on [her] body and holding [her] against [her] will for no reason." She "wiggled out, jumped over the couch," ran to the kitchen, and grabbed a knife from a magnetic strip. She felt she needed to defend herself, and the knife was closer than the door. Bohannon grabbed her, and he and Cessill took the knife from her within seconds. Bohannon then threw her out of the apartment. She did not know she had cut him during the scuffle.

According to Bohannon, Sullivan was angry and announced she was leaving. She pulled Cessill off the couch and told him, "[Y]ou're coming with me or I'm going to punch you in the face." Bohannon intervened, telling her not to punch anyone and that he wanted her to leave. As he led her toward the door, Sullivan "ran across [him] the wrong way into the kitchen area." He followed her, and she punched him in the nose multiple times. To this point, he had not touched Sullivan except on the arms. He grabbed her wrists and pulled her to

her hands and knees, then put his hand on her back, trying to calm her down. She stayed on the floor for 30 seconds to 2 minutes. Then she "twirled around and got up and grabbed [Bohannon's] kitchen knife, [his] big one." Bohannon grabbed at it, cutting his hand. Then Sullivan swung it down, cutting his wrist. Bohannon again grabbed her wrists and pulled her down to all fours. She was still holding the knife. At that point, Cessill got off the couch, grabbed Sullivan, and pulled her backward onto the couch. Bohannon took the knife away. He went to the kitchen, gathered up the other knives from the magnetic strip, took them to his bedroom, and threw them onto the floor on the far side of his bed. He saw that Cessill had made Sullivan pass out.

Similarly, Cessill testified that he woke up as Sullivan was standing over him and saying, "I'm going to punch you in the face." Cessill opened his eyes, and Sullivan told him he needed to leave immediately. Bohannon told Sullivan to leave Cessill alone and that she needed to leave. She became more upset. Bohannon and Sullivan argued very briefly, and then Sullivan went to the kitchen. As Bohannon followed her, Sullivan came out with a knife. She backed Bohannon against a wall and repeatedly slashed down with the knife, cutting his arm.[3] Cessill got up, grabbed Sullivan, and put her in a martial arts chokehold,

_____

[3] Cessill testified Sullivan never punched Bohannon but also indicated he could not see them when they were in the kitchen.

-4-

causing her to pass out and drop the knife. Bohannon took the knives from the kitchen and hid them. After a short time, Sullivan woke up and left.

The State charged Sullivan with second degree assault with a deadly weapon.[4] During Bohannon's testimony, a juror told the court he might know Bohannon through mutual acquaintances. The court denied Sullivan's request to excuse the juror for cause.

At the end of the trial, the court instructed the jury on self-defense. Over Sullivan's objection, the court gave a first aggressor instruction informing the jury that self-defense was not available if it found that Sullivan provoked the fight. Also over Sullivan's objection, the trial court declined to give an instruction stating that the amount of force necessary to defend one's self "may vary with the number of persons the defendant reasonably believes are" threatening violence.

During closing arguments, the prosecutor asserted that Sullivan had attempted to garner the jury's sympathy by suggesting she had been "fearful of some sort of sexual assault." Sullivan did not object.

The jury convicted Sullivan of second degree assault and found she was armed with a deadly weapon.[5] The trial court imposed an exceptional sentence

---

[4] RCW 9A.36.021(1)(c).
[5] RCW 9A.36.021(1)(c); RCW 9.94A.825.

of no jail time for the assault.[6]  It also allowed Sullivan to serve the mandatory 12-month deadly weapon enhancement[7] in the King County Community Center for Alternative Programs Enhanced (CCAP).  Sullivan and the State both appealed the judgment and sentence.  This court consolidated the appeals.

ANALYSIS

Juror 9

First, Sullivan contends that the trial court denied her right to an impartial jury by not excusing a juror who may have known Bohannon.  During a break in Bohannon's testimony, juror 9 told the trial court that he was "reasonably confident" he had met Bohannon and believed they might have mutual friends. He said he did not think they had ever had a conversation.  He said they might be friends on social media but could not recall having any exchanges on social media either.  He confirmed his uncertainty about actually knowing Bohannon. The judge asked juror 9 whether anything about this possible connection would make him concerned that it would be "awkward if [juror 9] didn't believe [Bohannon]."  The prosecutor asked if juror 9 could remember any interaction with Bohannon and if their possible connection "would have any

---

[6] The court based the exceptional sentence on RCW 9.94A.535(1)(a), which allows for mitigating circumstances where "the victim was an initiator, willing participant, aggressor, or provoker of the incident."

[7] RCW 9.94A.533(4)(b).

impact . . . whatever on you just watching him and assessing his credibility and his testimony as if it was anyone else." The juror answered "no" to each question.

The United States and Washington Constitutions guarantee a defendant the right to an impartial jury.[8] A party may challenge a juror for cause.[9] A judge must excuse "any juror, who in the opinion of the judge, has manifested unfitness as a juror," including "by reason of bias."[10] When a party challenges a juror for actual bias, even if the juror appears to have "formed or expressed an opinion upon what he or she may have heard or read," to excuse the juror "the court must be satisfied, from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially."[11] "[T]he trial court is in the best position to determine a juror's ability to be fair and impartial."[12] This court reviews that decision for abuse of discretion.[13]

Here, the trial court did not violate Sullivan's right to an impartial jury by declining to excuse juror 9. While juror 9 believed he might have mutual friends

---

[8] U.S. CONST. amend. VI; WASH. CONST. art. I, § 22.
[9] CrR 6.4(c).
[10] RCW 2.36.110; CrR 6.4(c).
[11] RCW 4.44.190; see RCW 4.44.170(2) ("Actual bias" means "a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging.").
[12] State v. Noltie, 116 Wn.2d 831, 839, 809 P.2d 190 (1991).
[13] State v. Jorden, 103 Wn. App. 221, 226, 11 P.3d 866 (2000).

with Bohannon, he did not think they had ever had a conversation. He stated that nothing about their possible connection would make him reluctant to disbelieve Bohannon and that that connection would have no impact on his assessment of Bohannon's credibility.

Even if juror 9 was confident that he recognized and had met Bohannon and thought they shared mutual friends, those facts alone would not require the court to excuse him. Nothing in the record indicates that the juror's potential acquaintance with Bohannon affected his opinion of Bohannon's credibility. Even if he had formed such an opinion, the trial court would need to be satisfied, from all the circumstances, that juror 9 could not disregard his opinion and decide the issue impartially.[14] The trial court was in the best position to make this judgment. The record affirmatively supports its decision that juror 9 could decide the case impartially. Thus, the trial court did not abuse its discretion in declining to excuse the juror.

First Aggressor Jury Instruction

Next, Sullivan contends that the trial court erred in giving the jury a first aggressor instruction. The court instructed the jury on self-defense and, over Sullivan's objection, instructed the jury, "[I]f you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct

---

[14] See RCW 4.44.190.

-8-

provoked or commenced the fight, then self-defense is not available as a defense."

When the record includes credible evidence from which a reasonable juror could find that the defendant provoked the need to act in self-defense, an aggressor instruction is appropriate.[15] Whether the State produced sufficient evidence to justify an aggressor instruction presents a question of law we review de novo.[16] We view the evidence in the light most favorable to the party requesting the instruction—here, the State.[17]

"[A]n aggressor or one who provokes an altercation" cannot successfully invoke the right of self-defense.[18] Although not favored, an aggressor instruction is proper "'where (1) the jury can reasonably determine from the evidence that the defendant provoked the fight, (2) the evidence conflicts as to whether the defendant's conduct provoked the fight, or (3) the evidence shows that the defendant made the first move by drawing a weapon.'"[19] The provoking act must be intentional conduct reasonably likely to provoke a belligerent response.[20] It

---

[15] State v. Riley, 137 Wn.2d 904, 909-10, 976 P.2d 624 (1999); Manzanares v. Playhouse Corp., 25 Wn. App. 905, 910, 611 P.2d 797 (1980).
[16] State v. Anderson, 144 Wn. App. 85, 89, 180 P.3d 885 (2008).
[17] State v. Wingate, 155 Wn.2d 817, 823 n.1, 122 P.3d 908 (2005).
[18] Riley, 137 Wn.2d at 909.
[19] State v. Stark, 158 Wn. App. 952, 959, 244 P.3d 433 (2010) (quoting Anderson, 144 Wn. App. at 89); Riley, 137 Wn.2d at 909-10.
[20] State v. Wasson, 54 Wn. App. 156, 159, 772 P.2d 1039 (1989).

cannot be words alone.[21] And it cannot be the charged assault.[22] But contrary to Sullivan's assertions, the provoking act can be part of a "single course of conduct" that leads to the assault.[23]

Sullivan contends that the trial court's first aggressor instruction here was both incorrect and unsupported by the evidence. We disagree.

The instruction correctly stated the law. In State v. Wingate,[24] the Supreme Court approved an instruction with nearly identical wording to the instruction here. Moreover, the instruction here is more specific and thus more favorable to the defendant than the one in Wingate. It required the jury find an "intentional violent act" rather than just an "intentional act."[25] Sullivan relies on State v. Arthur.[26] But the instructions here and in Wingate are distinguishable from those in Arthur. In Arthur, this court found an instruction that referred to a defendant's "unlawful act" to be overly vague, allowing the jury to speculate

---

[21] Riley, 137 Wn.2d at 912-13.

[22] State v. Kidd, 57 Wn. App. 95, 100, 786 P.2d 847 (1990).

[23] Rather, "[i]t has long been established that the provoking act must also be related to the eventual assault as to which self-defense is claimed." Wasson, 54 Wn. App. at 159. Sullivan cites decisions regarding double jeopardy and unanimity instructions—both issues that are inapplicable here. See State v. Villanueva-Gonzalez, 180 Wn.2d 975, 985, 329 P.3d 78 (2014); State v. Rodriquez, 187 Wn. App. 922, 937, 352 P.3d 200, review denied, 184 Wn.2d 1011 (2015).

[24] 155 Wn.2d 817, 821, 122 P.3d 908 (2005).

[25] Wingate, 155 Wn.2d at 821.

[26] 42 Wn. App. 120, 708 P.2d 1230 (1985).

about which act may have been unlawful. The court reasoned that an "unlawful act" could encompass an accidental collision with the victim's car. This court held that a trial court must direct an aggressor instruction toward intentional acts that the jury could reasonably assume would provoke a belligerent response.[27] The trial courts did precisely that here and in Wingate.

The evidence also supports the trial court's decision to give the first aggressor instruction. The evidence meets at least two of the three justifications for offering the instruction.[28] First, Bohannon and Cessill's testimony conflicts with Sullivan's about whether Sullivan's conduct provoked the fight. Both men testified that Sullivan attempted to pull Cessill off the couch and threatened to punch him, and Bohannon testified that Sullivan punched him in the face before he or Cessill used force against her. While "words alone" cannot defeat a self-defense claim, Sullivan combined her words with physical acts. Second, from the same testimony, the jury could reasonably determine that Sullivan provoked the fight. We therefore reject Sullivan's challenge to the aggressor instruction.

---

[27] Arthur, 42 Wn. App. at 124-25.

[28] See Stark, 158 Wn. App. at 959. As to the third justification, Sullivan admits she was the first person to draw a weapon. But none of the witnesses suggested that Sullivan was "ma[king] the first move" in doing so, as she and Bohannon were already tussling in all three accounts.

NO. 73217-0-I / 12 (consol.
with No. 73216-1-I) / 12

Multiple Assailants Instruction

Sullivan also contends that the trial court should have given this instruction that she proposed:

> As it is within the realm of common experience that two or more people are more likely to inflict injury than only one such person, the amount of force that is necessary to prevent the infliction of injury, and thus is not unlawful, may vary with the number of persons the defendant reasonably believes are about to commit or assist in an offense against a person.

We review de novo a trial court's refusal to give an instruction based on a ruling on the law.[29] Self-defense "instructions, read as a whole, must make the relevant legal standard 'manifestly apparent to the average juror.'"[30] Each side is entitled to have the jury instructed on its theory of the case when some evidence supports that theory.[31] Failure to instruct on a defense theory when evidence supports it is prejudicial error.[32]

In State v. Irons,[33] this court held that the trial court's self-defense instruction failed to "'make it manifestly clear to the jury that it could consider the fact that Irons was faced with multiple assailants.'" Four people had surrounded

---

[29] State v. Walker, 136 Wn.2d. 767, 772, 966 P.2d 883 (1998).
[30] State v. Irons, 101 Wn. App. 544, 550, 4 P.3d 174 (2000) (internal quotation marks omitted) (quoting State v. LeFaber, 128 Wn.2d 896, 900, 913 P.2d 369 (1996)).
[31] Riley, 137 Wn.2d at 908 n.1.
[32] State v. Williams, 132 Wn.2d 248, 259-60, 937 P.2d 1052 (1997).
[33] 101 Wn. App. 544, 552, 4 P.3d 174 (2000).

-12-

Irons. He had reason to fear all four, but he proceeded to injure only one.[34] Even so, the trial court instructed the jury that for Irons to succeed on a self-defense claim, the jury had to find that Irons "'reasonably believed that <u>the victim</u> intended to . . . inflict death or great personal injury; and . . . that there was imminent danger of <u>such harm</u> being accomplished.'"[35] This court found the instruction allowed Irons to argue his theory of the case. But its inconsistency with Irons's theory prejudiced his ability to present his "theory that he reasonably believed he was in imminent danger of death or great personal injury from multiple assailants—not just" the victim.[36]

Sullivan did not have to contend with any inconsistency. The trial court instructed the jury that force is lawful when a person "reasonably believes that he or she is about to be injured in preventing or attempting to prevent an offense against the person, and when the force is not more than is necessary." Nothing in this or other instructions limits the defendant's justification to a reasonable fear of one person or eventual victims, as in <u>Irons</u>. Unlike Irons, Sullivan had the opportunity to present her self-defense argument unimpeded by any inconsistent

---

[34] <u>Irons</u>, 101 Wn. App. at 558-59.
[35] <u>Irons</u>, 101 Wn. App. at 552 (alteration in original).
[36] <u>Irons</u>, 101 Wn. App. at 559.

jury instructions. Instead, the trial court's instructions made the applicable self-defense standard "manifestly apparent" to the jury.[37]

Sullivan contends that failure to give the instruction prejudiced her because she was entitled to argue her theory and sufficient evidence supported the instruction.[38]

This court evaluates each jury instruction "in the context of the instructions as a whole."[39] "It is not error to refuse to give a cumulative instruction or one collateral to or repetitious of instructions already given."[40]

Sullivan's theory was self-defense, and the trial court instructed the jury on that theory. Her testimony supports her theory that she was justified in defending herself against both Bohannon and Cessill. But here a multiple assailant instruction would have been cumulative of the trial court's other instructions. As discussed above, the jury instructions adequately conveyed that Sullivan could fear multiple assailants, including people she was not charged with injuring.

Because the trial court's self-defense instructions were sufficient and allowed Sullivan to argue her theory of the case and because the proposed

---

[37] Irons, 101 Wn. App. at 550.
[38] See Williams, 132 Wn.2d at 259.
[39] State v. Benn, 120 Wn.2d 631, 654-55, 845 P.2d 289 (1993).
[40] Benn, 120 Wn.2d at 655.

-14-

multiple assailant instruction was cumulative, we reject Sullivan's challenge to the trial court's refusal to give that instruction.

Closing Arguments

Next, Sullivan contends that the prosecutor appealed to jurors' passions and prejudices in asserting that Sullivan had implied she feared being sexually assaulted.

When claiming prosecutorial misconduct, the defendant has the burden of proving that the prosecutor's conduct was both improper and prejudicial.[41] In closing arguments, attorneys have "'latitude to argue the facts in evidence and reasonable inferences.'"[42] They may not, however, "urg[e] the jury to decide a case based on evidence outside the record."[43] And they may not make "[m]ere appeals to the jury's passion or prejudice."[44]

If a prosecutor's statements are improper, then this court determines whether those statements prejudiced the defendant.[45] When, as here, the defendant did not object at trial, the defendant waived any error unless the misconduct was "so flagrant and ill intentioned that an instruction could not have

---

[41] State v. Emery, 174 Wn.2d 741, 756, 278 P.3d 653 (2012).
[42] State v. Dhaliwal, 150 Wn.2d 559, 577, 79 P.3d 432 (2003) (quoting State v. Smith, 104 Wn.2d 497, 510, 707 P.2d 1306 (1985)).
[43] State v. Pierce, 169 Wn. App. 533, 553, 280 P.3d 1158 (2012).
[44] State v. Gregory, 158 Wn.2d 759, 808, 147 P.3d 1201 (2006).
[45] Emery, 174 Wn.2d at 760.

cured the resulting prejudice."[46] "Under this heightened standard, the defendant must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'"[47] In short, this court asks, "[H]as such a feeling of prejudice been engendered or located in the minds of the jury as to prevent a [defendant] from having a fair trial?'"[48]

Here, in describing the fight, Sullivan testified,

> A.   . . . . We were rolling around on the floor and next thing I know I have a second boy on top of me. I—I don't know—I did not see, I don't know why, I don't know how. But then I had two boys on top of me.
>
> . . . .
>
> A.   I was terrified.
>
> Q.   And what were you terrified they might do to you?
>
> A.   I just knew that I was getting hurt. That's—that's all. And I was scared and people were putting their hands on my body and holding me against my will for no reason.

At other points in her testimony, Sullivan again referred to having "two boys" "on top of me," and she spoke about her fears during the fight: "I was

---

[46] Emery, 174 Wn.2d at 760-61. This court focuses more on whether an instruction could have cured the prejudice than whether the comments were flagrant and ill intentioned. Emery, 174 Wn.2d at 762.

[47] Emery, 174 Wn.2d at 761 (quoting State v. Thorgerson, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

[48] Emery, 174 Wn.2d at 762 (alteration in original) (quoting Slattery v. City of Seattle, 169 Wash. 144, 148, 13 P.2d 464 (1932)).

really scared. If I'm already getting beat up by two boys what's going to come next, you know?"

Earlier in Sullivan's testimony, her counsel asked whether she and Bohannon had a romantic relationship. Sullivan testified,

> A.    I woke up cuddled with him on the couch once, half dressed, and I wasn't sure what happened because we were pretty drunk the night before. And he's the one who informed that we had—had sex. And I just kind of pretended it never happened and let it go. He's—I'm not in any way, shape, or form romantically interested in him.
>
> . . . .
>
> Q.    And you—you had just mentioned that time when you did have—you were told you had a sexual—
>
> A.    I wasn't happy about it.
>
> Q.    Did you have—did you ever have a sexual encounter with him any time besides that time?
>
> A.    No. No.
>
> Q.    And how long before this incident that we're—we've all been talking about did that happen?
>
> A.    Maybe two weeks before this incident.

In closing, the prosecutor suggested that Sullivan had testified she was "fearful of some sort of sexual assault" and argued that she had testified to the two men "grabbing her body" because "she wants to have the strongest emotional reaction," since "any kind of sexual assault is heinous."

We conclude that the prosecutor's argument reasonably characterized Sullivan's testimony. In recounting the fight, Sullivan repeatedly mentioned her fear at having "two boys" "on top of me," "putting their hands on my body." She and her counsel both raised the question of where the situation would lead. This account, combined with Sullivan's prior testimony that she regretted having sex with Bohannon and would not have consented to it if she had been sober, make it reasonable for the prosecutor to argue that she had implied she feared being sexually assaulted. The prosecutor did not rely on facts outside the record or appeal to the jury's passion or prejudice in suggesting that Sullivan wanted the jury to "have the strongest emotional reaction."[49] Rather, that argument fell within the prosecutor's wide latitude to draw reasonable inferences from the evidence. Because the argument was not improper, we do not need to decide whether an instruction could have cured any prejudice that resulted.

---

[49] The prosecutor's remarks are also less prejudicial on their face than remarks Washington courts have found improper. See State v. Miles, 73 Wn.2d 67, 69-70, 436 P.2d 198 (1968) (improper and prejudicial to admit hearsay evidence alleging a plan by defendants to perpetrate a robbery like the one with which they were charged); State v. Belgarde, 110 Wn.2d 504, 506-07, 755 P.2d 174 (1988) (improper and prejudicial to describe American Indian defendant as a leader of a "'deadly group of madmen'" and "'butchers, that killed indiscriminately'"); State v. Claflin, 38 Wn. App. 847, 850, 690 P.2d 1186 (1984) (improper and prejudicial to read "vivid and highly inflammatory" poem by anonymous rape victim to jury during closing argument).

Appellate Costs

Finally, Sullivan asks this court to deny appellate costs should the State prevail.

"The commissioner or clerk 'will' award costs to the State if the State is the substantially prevailing party on review, 'unless the appellate court directs otherwise in its decision terminating review.'"[50] This court has discretion to consider the issue of appellate costs when a party raises the issue in its brief.[51]

In State v. Sinclair,[52] this court used its discretion to deny appellate costs to the State where the defendant remained indigent and this court saw "no realistic possibility," given that the defendant was 66 years old and received a 280 month prison sentence, that he would be able to pay appellate costs.

We decline to decide appellate costs at this stage. Sullivan's age and length of sentence distinguish her from Sinclair. If the commissioner or court clerk approves a cost bill from the State, RCW 10.73.160(4) allows the sentencing court to remit costs if payment would "impose manifest hardship" on Sullivan or her family.[53]

---

[50] State v. Sinclair, 192 Wn. App. 380, 385-86, 367 P.3d 612 (quoting RAP 14.2), review denied, 185 Wn.2d 1034 (2016).
[51] Sinclair, 192 Wn. App. at 388-90.
[52] 192 Wn. App. 380, 393, 367 P.3d 612, review denied, 185 Wn.2d 1034 (2016).
[53] State v. Nolan, 98 Wn. App. 75, 79, 988 P.2d 473 (1999).

CCAP Sentence for Deadly Weapon Enhancement

The State contends, in a cross appeal, that the trial court did not have the authority to sentence Sullivan to no time in confinement for the mandatory one-year deadly weapon enhancement. The trial court instead sentenced her to one year in King County's CCAP.

Second degree assault is a class B felony and a violent offense.[54] Class B felonies committed after 1995 with a deadly weapon other than a firearm carry a mandatory one-year enhancement.[55] When this enhancement applies, courts must impose it "even if facts permit a departure from the standard range for the underlying offense."[56]  "Notwithstanding any other provision of law," the enhancement must "be served in total confinement."[57]  With exceptions not applicable here, "'[t]otal confinement' means confinement inside the physical boundaries of a facility or institution operated or utilized under contract by the state or any other unit of government for twenty-four hours a day."[58]

---

[54] RCW 9A.36.021(2)(a); RCW 9.94A.030(55)(a)(viii). Amendments to RCW 9.94A.030, effective August 1, 2009, changed the numbering but not the relevant content of the definitions.

[55] RCW 9.94A.533(4)(b).

[56] State v. Graham, 181 Wn.2d 878, 884, 337 P.3d 319 (2014) (interpreting RCW 9.94A.533).

[57] RCW 9.94A.533(4)(e).

[58] RCW 9.94A.030(52).

RCW 9.94A.680 allows for alternative sentencing for offenders with sentences of one year or shorter. The only alternative that applies to violent offenders allows that "[o]ne day of partial confinement may be substituted for one day of total confinement."[59]

Here, the trial court imposed the mandatory one-year sentence for the deadly weapon enhancement. That sentence must be served in total confinement.[60] Since RCW 9.94A.680(1) allows a sentencing court to substitute partial confinement for total confinement, the trial court could sentence Sullivan to one year of CCAP only if CCAP qualifies as "partial confinement."

As Sullivan concedes, the Supreme Court already decided, in State v. Medina,[61] that CCAP is not "partial confinement." Sullivan asks this court to examine the statutory scheme to decide if the difference between her circumstances and the defendant's in Medina justifies a departure from that binding opinion. She suggests no distinctions, though, and we see none. Medina prohibited the trial court from allowing Sullivan to satisfy the deadly weapon enhancement with CCAP participation.

---

[59] RCW 9.94A.680(1).
[60] See RCW 9.94A.533(4)(e).
[61] Medina, 180 Wn.2d at 289 ("[W]e do not think that participation in the educational, counseling, and service-oriented programs entailed in CCAP meets the statutory definition of 'confinement.'").

Credit for Time Served in CCAP

The State also contends that the trial court could not credit Sullivan for time she already served in CCAP toward the one-year deadly weapon sentence.

An offender sentenced to confinement has both a constitutional and a statutory right to receive credit for time the offender served before sentencing.[62] "[A] defendant's ineligibility for a particular type of partial confinement postconviction is not relevant to the question of whether that defendant must be credited for pretrial time served in that same type of partial confinement."[63]

RCW 9.94A.680(3) allows the court to credit the offender for time served before sentencing "in an available county supervised community option." As noted above, that provision applies only to "offenders convicted of nonviolent and nonsex offenses."[64] The Supreme Court confirmed, in Medina, that the statute does not permit the community option for violent offenders.[65] The trial court thus exceeded its authority in crediting Sullivan for time served in CCAP toward her one-year sentence for a violent offense.

---

[62] State v. Speaks, 119 Wn.2d 204, 206, 829 P.2d 1096 (1992); RCW 9.94A.505(6).

[63] Medina, 180 Wn.2d at 288 (citing Speaks, 119 Wn.2d at 208).

[64] RCW 9.94A.680(3).

[65] Medina, 180 Wn.2d at 290 (applying canon of expressio unius est exclusio alterius). As the Supreme Court determined that the 2009 amendments adding 9.94A.680(3) did not apply retroactively to Medina's crime, that portion of the opinion is dicta. Nonetheless, we follow the Supreme Court's guidance.

Sullivan does not contest the State's statutory arguments. She challenges, instead, the injustice, as a matter of policy, of sentencing her to confinement because CCAP would better benefit her, her health, and the community. She further notes the inherent inconsistency of sentencing her to 12 months for the deadly weapon enhancement while imposing 0 months for the underlying crime due to Bohannon's partial culpability.

Whatever the trial court may have thought about the wisdom behind imposing a mandatory year of confinement for any crime committed with a deadly weapon, Washington courts have "consistently held that the fixing of legal punishments for criminal offenses is a legislative function."[66] The legislature's enactments prohibited the trial court from sentencing Sullivan to CCAP or awarding her credit for time already spent in CCAP. We therefore vacate those provisions and remand the case to the trial court for resentencing consistent with this opinion.

---

[66] State v. Ammons, 105 Wn.2d 175, 180, 713 P.2d 719, 718 P.2d 796 (1986).

## CONCLUSION

We affirm Sullivan's conviction and remand for resentencing.

_Leach, J._

WE CONCUR:

_Dwyer, J._

_Appelwick, J._