**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

STATE OF WASHINGTON,      )    No. 76819-1-I

              Respondent,     )

                            )    DIVISION ONE

               v.             )

                            )    UNPUBLISHED OPINION

RANDY EUGENE HAMILTON,    )

              Appellant.      )    FILED: March 18, 2019

                                  )

MANN, A.C.J. — Randy Hamilton appeals his conviction of assault in the second degree under RCW 9A.36.021(1)(a) for punching Eric Friel. Hamilton argues: (1) that the court erred by giving a first aggressor instruction, (2) the State failed to prove the absence of self-defense beyond a reasonable doubt, (3) the trial court committed prejudicial error by commenting on the evidence, and (4) that the prosecutor committed misconduct during closing argument. We affirm.

I.

On the evening of Friday, December 11, 2015, Friel and his partner, Darlene Howerton, went to a bar at Riverside Lanes in Mount Vernon for Friday night karaoke. The karaoke show was hosted by Hamilton. Friel and Howerton were regulars at

Hamilton's weekly show. Christopher Camp, another friend, accompanied Friel and Howerton as a designated driver.

Hamilton and Friel were close friends for several years before the December 2015 incident. Friel and Hamilton's relationship, however, was recently strained. Hamilton suspected Friel was stealing his karaoke business by hosting his own karaoke nights at his house.[1]

Toward the middle of the night on December 11, a friend of Friel's wanted Friel to sing a karaoke song and offered to take Friel's song slip up to Hamilton. Hamilton refused to play the song. Later in the night, another friend was singing a song with the words "got a good woman at home" and Hamilton said over the microphone, "so does Eric [Friel]," or "I bet Eric [Friel] does too." Friel took Hamilton's comment as condescending, because at the time he was unemployed and being supported by Howerton.

As the night was ending, Hamilton packed up some of his karaoke gear and took it to his car in the back-parking lot. Hamilton started his car to let it warm up and then went back into Riverside Lanes to finish cleaning up. Hamilton and the State presented conflicting stories of the events that happened next.

According to the State, on December 12 at about 1:30 a.m., Friel went out the back door of Riverside Lanes with Camp to smoke a cigarette while Howerton paid their tab. Camp's car was parked nearby and they were getting ready to leave. The State argues that Hamilton came out to confront Friel; he was upset Friel was at the show.

---

[1] Friel testified that he hosted free shows on the same nights as Hamilton but Friel was under the impression that Hamilton got paid regardless of the amount of people who showed up to Hamilton's karaoke nights. That was Friel's assumption and not based on anything Hamilton told him.

Hamilton walked straight up to Friel and positioned his body in front of him. Hamilton held his arms out to the side and said something to the effect of, "What did you want to talk to me about?" Friel sensed he was about to be assaulted, flicked his half-smoked cigarette away, and removed his glasses. Hamilton then hit Friel with a hard and fast left hook to the face. The force of the blow sent Friel back into the glass door he was standing next to, which shattered or "spiderweb[bed]." Camp intervened and escorted Hamilton away from Friel. After a brief discussion in the interior hallway with Camp, Hamilton came out, surveyed the scene, and left.

According to Hamilton, while he was on his way to the car, he came upon Friel and Camp standing just outside the exit smoking a cigarette. Hamilton did not know Camp well and was concerned Friel and Camp might be planning to ambush him. Hamilton asked Friel whether Friel had anything to say to him: "What do you want to talk to me about?" Hamilton made a common movement while asking this question—he opened his palms and spread his arms slightly. Friel did not respond verbally; instead, he looked away from Hamilton, flicked his cigarette, and removed his eyeglasses. Hamilton knew that Friel took off his glasses before he threw a punch or got into a fight. Camp thought Friel removed his glasses because he was preparing to fight Hamilton. Hamilton also knew that Friel drank a lot of alcohol that night. Because he suffered from a bad back and did not want to get injured further; Hamilton protected himself by striking first; he "instinct[ively]" threw a punch at Friel, who fell and broke his nose.

A surveillance video camera captured the events outside of Riverside Lanes without audio. The video shows Hamilton looking at Friel leaning on the wall next to the back door. As Hamilton exits Riverside Lanes, he approaches Friel and appears to say

something to Friel with both of his arms slightly outstretched with his palms facing forward. In the video, as soon as Friel's glasses are in his hand, Hamilton punches Friel in the nose. The force pushes Friel into the glass door and Friel falls to the ground. The confrontation lasts approximately 6 seconds between the time Hamilton walked outside to when Friel hits the ground. Camp, whose back was to the fight, becomes aware of the situation and positions himself between Friel and Hamilton, directing Hamilton back into the building. At the end of the video footage, Hamilton exits the building less than a minute after the fight, walks across the parking lot to his car, and drives away.

The State charged Hamilton with assault in the second degree, malicious mischief in the third degree, and harassment. The malicious mischief charge was dropped in an amended information and the harassment charge was dismissed on the State's voluntary motion to dismiss.

At trial, Justin Mason, Howerton's son-in-law, testified that he had been in a fight with Friel. Mason explained that Howerton and Friel were hosting a party at their home. Mason was in the house asleep when he was woken by someone telling him his truck was about to be hit. Mason angrily exited the house and bumped into Friel, knocking him over. After getting off the ground, Friel "sucker punched" Mason, for no apparent reason. Hamilton testified that he was aware of this altercation.

Eric Bates, Hamilton's son, testified about a physical altercation with Friel when they had a disagreement, which resulted in Friel tackling Bates to the ground. Bates also testified that Friel came to his aid in two instances; one, where Bates was jumped at a bar, and a second, outside the bar where Bates was engaged in a one-on-one fight.

4

Hamilton witnessed, in the first instance, the altercation in the bar where Friel assisted his son. Hamilton stated he was grateful that Friel came to his son's aid. But in the second instance, Hamilton intervened, telling Friel to let his son fight one-on-one because it was a fair fight.

Hamilton testified that Friel would attack a person from behind to get an advantage, implying that Friel does not fight fair. Hamilton testified that he felt if he walked away from Friel, or turned his back to him, Friel may have "sucker punched" him.

At Hamilton's request, the trial court provided the jury with a full range of self-defense pattern instructions including, 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL (WPIC) 17.02 (lawful force), 17.04 (explaining actual danger is not necessary), and 17.05 (no duty to retreat). At the State's request the trial court also provided an instruction based on WPIC 16.04, which explains the restrictions on lawful use of self-defense by a first aggressor.[2] Hamilton objected to the first aggressor instruction.

The jury returned a guilty verdict. Hamilton moved for a new trial under CrR 7.4, or an arrest of judgment under CrR 7.5. Hamilton argued the State did not prove absence of self-defense beyond a reasonable doubt and the first aggressor instruction resulted in prejudicial error. The court denied the posttrial motions and stayed Hamilton's sentence, pending this appeal.

---

[2] Instruction 15 read:
 No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense and thereupon use, offer, or attempt to use force upon or toward another person.
 Therefore if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense is not available as a defense.

II.

Hamilton first argues that the trial court erred by giving the first aggressor instruction. We disagree.

When there is credible evidence from which a reasonable juror could find that the defendant provoked the need to act in self-defense, a first aggressor instruction is appropriate. State v. Riley, 134 Wn.2d 904, 909-910, 976 P.2d 624 (1999); State v. Sullivan, 196 Wn. App. 277, 289, 383 P.3d 574 (2016), review denied, 187 Wn.2d 1023 (2017). Whether the State produced sufficient evidence to justify the first aggressor instruction is a question of law and reviewed de novo. Sullivan, 196 Wn. App. at 289. We view the evidence in the light most favorable to the party that requested the instruction—here, the State. Sullivan, 196 Wn. App. at 289. The State need only produce some evidence that the defendant was the aggressor to meet its burden of production. State v. Anderson, 144 Wn. App. 85, 89 180 P.3d 885 (2008) (citing Riley, 137 Wn.2d at 909). The provoking act must be intentional and one that a "jury could reasonably assume would provoke a belligerent response by the victim." State v. Wasson, 54 Wn. App. 156, 159, 722 P.2d 1039 (1989).

An aggressor instruction impacts a defendant's claim of self-defense, which the State bears the burden of disproving beyond a reasonable doubt, therefore trial courts should exercise care in giving first aggressor instructions. Riley, 137 Wn.2d at n.2.

"'[A]n aggressor or one who provokes an altercation' cannot successfully invoke the right of self-defense." Sullivan, 196 Wn. App. at 289 (quoting Riley, 137 Wn. 2d at 909). While our Supreme Court has urged care in giving the instruction,[3] a first

_____

[3] "While an aggressor instruction should be given where called for by the evidence, an aggressor instruction impacts a defendant's claim of self-defense, which the State has the burden of disproving

6

aggressor instruction is appropriate "where (1) the jury can reasonably determine from the evidence that the defendant provoked the fight; (2) the evidence conflicts as to whether the defendant's conduct provoked the fight; or (3) the evidence shows that the defendant made the first move by drawing a weapon." Anderson, 144 Wn. App. at 89 (citing Riley, 137 Wn.2d at 909-10). "A court errs when it submits an aggressor instruction and the evidence shows that the defendant used words alone to provoke the fight." Anderson, 144 Wn. App. at 89 (citing Riley, 137 Wn.2d at 909-10).

Here there was sufficient evidence of at least an evidentiary conflict as to whether Hamilton's conduct provoked the fight. As the trial court explained:

> I think Mr. Friel testified that the reason he took off his glasses and threw the cigarette away is he thought something was going to start or something to that effect . . . I think if you look at this video as well, I think it's conflicting of who the aggressor was. If you look at the video it's clear that Mr. Hamilton came out of the door of the bowling alley. It's conceivable the jury could say he's the one that confronted. He could have walked past Mr. Friel at the time. He's the one who confronted him . . . I think there's enough there of conflicting evidence of who the aggressor was, whether the defendant was the one whose conduct really precipitated the fight. I think that's a jury decision. I think based upon that conflicting evidence I think I'm inclined to give the first aggressor instruction along with the self-defense instruction as well.

We agree. Although words alone are insufficient to warrant a first aggressor instruction, Hamilton's body language could be construed by a reasonable juror as aggressive. See Riley, 137 Wn.2d at 911. From the surveillance video, it is apparent that immediately after exiting Riverside Lanes, Hamilton walked straight to Friel, and was close enough physically to Friel that he did not need to take a step forward to punch Friel. Hamilton knew that Friel was drunk and had a tendency to be more

---

beyond a reasonable doubt. Accordingly, courts should use care in giving an aggressor instruction." Riley, 137 Wn.2d at 910, n.2.

aggressive when drunk, yet immediately engaged him upon exiting Riverside Lanes. Hamilton counters there was testimony by Camp that Hamilton's tone was not aggressive, but Hamilton's body language and closeness to Friel could be construed by a reasonable juror as aggressive.

Hamilton argues that he subjectively believed in the moment he saw Friel and Camp outside the back door of Riverside Lanes that they were about to ambush him. Hamilton indicated he saw Camp standing on the path leading towards the parking lot, and thought Camp was intentionally blocking the way to his car. At the same time, Friel was standing next to the back door of Riverside Lanes giving Hamilton a menacing look. Under those circumstances, Hamilton testified that he was "not turning [his] back on [Friel]" because he was concerned Friel would attack him from behind.

However, Hamilton's testimony is contradicted by both Camp and Friel's testimony that they were outside merely waiting for Howerton and smoking a cigarette. Additionally, the surveillance footage does not support two men lying in wait for Hamilton. Camp has his back to the door when Hamilton exited the building, and did not make any aggressive movement towards Hamilton once he realized that Hamilton punched Friel. Instead, Camp intervened between Hamilton and Friel, and redirected Hamilton back inside Riverside Lanes. Based on the visual evidence in the surveillance video, a reasonable juror could have concluded that Hamilton's testimony was not credible because he immediately approached Friel and did not look towards Camp's direction once Friel fell to the ground, suggesting Hamilton was not truly fearful of either Friel or Camp.

8

Based on all the evidence presented by both the State and Hamilton, there is sufficient conflicting evidence to warrant a first aggressor instruction.

### III.

Hamilton next contends that the State failed to prove the absence of self-defense beyond a reasonable doubt. We disagree.

A defendant who claims to have acted in self-defense bears only the obligation to produce evidence, from whatever source, tending to establish self-defense. State v. Roberts, 88 Wn.2d 337, 345, 562 P.2d 1259 (1977). "The obligation to prove absence of self-defense must remain at all times with the prosecution." Roberts, 88 Wn.2d at 345. The standard of review for whether the State proved the absence of self-defense beyond a reasonable doubt is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980).

"Evidence of self-defense is evaluated 'from the standpoint of the reasonably prudent person, knowing all the defendant knows and seeing all the defendant sees.'" State v. Walden, 131 Wn.2d 469, 473, 932 P.2d 1237 (1997). This standard has both objective and subjective components. Walden, 131 Wn.2d at 474. The subjective component requires the jury to perceive the situation as the defendant perceived it and consider all the facts and circumstances known to the defendant at the time of the incident. Walden, 131 Wn.2d at 474. The objective component requires the jury to determine whether the defendant's actions comport with a reasonably prudent person similarly situated as the defendant. Walden, 131 Wn.2d at 474.

Hamilton contends that he presented a wealth of evidence to support his self-defense theory. This includes evidence demonstrating Friel was a frequent fighter, fought more when he was drunk, and removed his eyeglasses immediately prior to fighting. Additionally, the jury heard evidence from a law enforcement officer that removing eyeglasses can be considered a "pre-attack indicator." Hamilton also presented evidence that he believed Friel was about to punch him, that Hamilton was unfamiliar with Camp, and worried about being ambushed by both Friel and Camp. Finally, Hamilton was concerned about his injured back and that Friel may attack him from behind if he attempted to walk away.

However, as the State argues, it presented evidence demonstrating that Hamilton was not acting in self-defense. The State presented evidence that this was an unprovoked assault, which included Camp's testimony that he considered Hamilton a friend, and Camp and Friel's testimony that they were waiting for Howerton to pay the bar tab—not lying in wait for Hamilton. The jury also viewed the surveillance footage of the incident and could have concluded that Hamilton was not afraid of being ambushed by Camp because Hamilton did not look in Camp's direction after assaulting Friel.

Although Hamilton did not have a duty to retreat, he could have avoided Friel by waiting for him to leave or walking around him. Instead, Hamilton immediately engaged Friel upon exiting Riverside Lanes, even though the surveillance video demonstrated Hamilton had other options at his disposal. A juror weighing the evidence could have concluded that since Hamilton immediately engaged Friel, he was looking for confrontation.

Viewing the evidence in the light most favorable to the State, a reasonable juror could have found that the State proved the absence of self-defense and elements of assault beyond a reasonable doubt.

IV.

Hamilton next argues that the trial court impermissibly commented on the evidence during closing. We disagree.

The standard of review for a claim of judicial comment on the evidence is whether the error was harmless beyond a reasonable doubt. State v. Levy, 156 Wn.2d 709, 712, 132 P.3d 1076 (2006). Under article IV, section 16 of the Washington State Constitution, "[j]udges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." A failure to object or move for a mistrial does not foreclose a defendant from raising the issue on appeal because a comment on the evidence is an error of constitutional magnitude. State v. Becker, 132 Wn.2d 54, 64, 935 P.2d 1321 (1997).

A statement by the court is an impermissible comment on the evidence if either, the court's attitude toward the merits of the case, or the court's evaluation relative to the disputed issue is inferable from the statement. State v. Lane, 125 Wn.2d 825, 838, 889 P.2d 929 (1995). In determining constitutional error, the issue is whether the trial court's feeling has been communicated to the jury as to the truth value of the testimony of a witness. Lane, 125 Wn.2d at 838.

If the court's statement was a comment on the evidence a reviewing court will presume the comment was prejudicial. Lane, 125 Wn.2d at 838. The burden rests with

the State to show that no prejudice resulted "unless it affirmatively appears in the record that no prejudice could have resulted from the comment." Lane, 125 Wn.2d at 838-39.

Hamilton argues the judge's reference to Mason's testimony that Friel sucker punched someone in the past could have made a reasonable juror disregard Hamilton's own testimony about witnessing Friel sucker punch someone in the past. During closing argument, the defense objected to the State's characterization of the evidence in the following exchange:

> Mr. Neilsen [State]: Again, because this was talked about, sucker puncher that was the term, I submit to you that was continually used by defense counsel but was not actually evidence in the trial brought up by the witnesses, right? But in this case who actually was the sucker puncher? It certainly wasn't Mr. Friel.
>
> Mr. Volluz [defense]: Your Honor, I'm sorry to object but just to bring up the fact that it was Justin Bates, [sic] who characterized the punch he got from Mr. Friel, as a sucker punch.
>
> The Court: Members of the jury, I believe there were some statements from that one witness in that regard. However as we previously instructed you are the determiners of the evidence. What you heard has been described and the descriptions by the attorney are not the evidence or not the law. You have to rely upon your memory as to what the witnesses testified to.[4]

The defense timely objected but mischaracterized the evidence by failing to state that both Justin Mason and Randy Hamilton had testified that Friel sucker punched someone in the past and incorrectly identified Eric Bates as the testifying witness. The trial court agreed that there was testimony to that effect, but also perpetrated the mischaracterization by agreeing with the defense counsel's incorrect statement. The court indicated, however, that the jurors must rely on their memory of the witnesses' testimony.

---

[4] (Emphasis added.)

We first consider whether the statement by the trial court constitutes a comment on the evidence. If a statement made by the trial court relates to a disputed issue of fact, then an express conveyance of the judge's opinion to the jury regarding the evidence is an impermissible comment on the evidence. Lane, 125 Wn.2d at 839. The reviewing court can also focus on whether the comment could have influenced the jury. Lane, 125 Wn.2d at 839.

In Lane, the court commented on a disputed fact which improperly removed the issue from the jury's determination. Lane, 125 Wn.2d at 837. Blake, a testifying witness, had been released early from jail. Lane, 125 Wn.2d at 836. The defense in Lane argued the State released Blake early in exchange for testimony, while the State argued Blake's anonymity as an informant was revealed and he was placed in jeopardy, requiring early release. Lane, 125 Wn.2d at 836, 839. The court commented on the testimony stating:

> The sentence of William Blake was reduced to three months confinement and release date of June 8, 1988 given. The reasons advanced by the prosecutor and accepted by the judge related to Mr. Blake's safety and an inadvertent disclosure near [sic] of Mr. Blake's cooperation with authorities given to an unidentified person. Whether that last statement proves or does not prove anything is a matter for the jurors.
>
> Now instruction on the law. The testimony of Mr. Blake regarding prior statements of Mr. Anderson may be considered by you in determining Mr. Anderson's credibility and for no other purpose.

Lane, 125 Wn.2d at 837. Our Supreme Court held that the trial court had charged the jury with a fact and expressly conveyed his opinion regarding the evidence, and thus the statement was an impermissible comment on the evidence. Lane, 125 Wn.2d at 839. The court in Lane, however, ultimately held that the constitutional error was harmless.

13

"A constitutional error is harmless if the untainted evidence is so overwhelming that it necessarily leads to a finding of guilt." Lane, 125 Wn.2d at 839.

The State argues that the prosecutor's comment accurately represented the evidence because the defense used the term "sucker puncher" during closing, but there had been no actual testimony that Friel was a "sucker puncher." In the alternative, the State argues that the court did not tell the jury to disregard Hamilton's testimony, and it cannot be reasonably inferred that the court was specifically directing the jury to disregard Hamilton's testimony because the court did not believe Hamilton.

The statement by the trial court was not an impermissible comment on the evidence. Although neither defense counsel nor the trial court properly characterized the evidence, the court cautioned the jurors to use their own recollection of the evidence and reminded them that closing argument was not evidence. The court only commented on the evidence to rule on the defense's objection. The court agreed with defense counsel that there was testimony about sucker punching but did not make any statement about the testimony that would tend to create the inference that the judge believed or disbelieved any of the testimony about sucker punching.

We conclude that the trial court did not improperly comment on the evidence.

V.

Hamilton next argues that the prosecutor committed misconduct during closing argument. We disagree.

Allegations of prosecutorial misconduct are reviewed for abuse of discretion. State v. Lindsay, 180 Wn.2d 423, 430, 326 P.3d 125 (2014). "If the defendant fails to object or request a curative instruction, the issue of misconduct is waived unless the

conduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." Lindsay, 180 Wn.2d at 430. "When reviewing a claim that prosecutorial misconduct requires reversal, the court should review the statements in the context of the entire case." State v. Thorgerson, 172 Wn.2d 438, 443, 258 P.3d 43 (2011).

We first consider whether the prosecutor's comments were improper, and if so, whether the improper comments caused prejudice. Lindsay, 180 Wn.2d at 431. A prosecutor may not express a personal opinion as to credibility of a witness or the guilt of a defendant. Lindsay, 180 Wn.2d at 438. Additionally, a prosecutor may not "present altered versions of admitted evidence [during closing arguments] to support the State's theory of the case." State v. Walker, 182 Wn.2d 463, 477, 341 P.3d 976 (2015).

If we find that the prosecutor's comments were improper, a defendant must also demonstrate that the statement caused prejudice. Lindsay, 180 Wn.2d at 440. To show prejudice, the defendant must show a substantial likelihood that the prosecutor's statements affected the jury verdict. Lindsay, 180 Wn.2d at 440.

Hamilton argues that the prosecutor committed misconduct in three ways: first, by arguing no evidence supported Friel being a "sucker puncher," second, by improperly inserting his personal belief that the punch Hamilton threw, "looked like a hard hit to me," and third, by improperly quoting "unspecified extra-record legal authority."

The defense timely objected to the first alleged act of misconduct, but failed to object during closing, or in a posttrial motion to the second or third alleged acts of misconduct. Both the second and third issues were waived because Hamilton failed to object and the alleged misconduct does not rise to the level of being so flagrant and ill

15

intentioned that an instruction could not have cured the prejudice that Hamilton alleges. Consequently, we only address Hamilton's claim that the prosecutor committed misconduct by arguing there was no evidence about Friel being a "sucker puncher."

A misstatement of the evidence can constitute prosecutorial misconduct. Walker, 182 Wn.2d at 477. However, prosecutors have "wide latitude to make arguments and draw inferences from the evidence." State v. Brown, 132 Wn.2d 529, 565, 940 P.2d 546 (1997). This claim is reviewed for an abuse of discretion. Lindsay, 180 at 430.

In Walker, a case where the reviewing court found misconduct, the misconduct was the result of a PowerPoint presentation used by the prosecutor during closing arguments. Walker, 182 Wn.2d at 477. The presentation was prejudicial to the defendant because the prosecutor's personal beliefs about the defendant were apparent. Walker, 182 Wn.2d at 477. The court held that the PowerPoint presentation was a mischaracterization of the evidence because it contained exhibits altered with inflammatory captions and superimposed text, suggestive to the jury that the defendant should be convicted because he was callous and greedy, rather than because the State proved its case beyond a reasonable doubt. Walker, 182 Wn.2d at 477.

Here, the State argues that the prosecutor's statement during rebuttal argument was not a mischaracterization of the evidence because the prosecutor was responding to the defense's repeated characterization of testimony that Friel is a "sucker puncher" rather than the actual testimony that Friel had "sucker punched" people in the past. The defense characterized Friel as a "sucker puncher" multiple times during closing: (1) "[t]he first thing [Randy] knows is that Eric is a sucker puncher," (2) "Randy also knows that Eric is a sucker puncher from the incident at the Castle Tavern," (3) "these are the

things that Randy knows about Eric and that he is a sucker puncher," and (4) "[h]ere's a few things for you to consider based on the evidence . . . . Randy is not a sucker puncher. That's Eric Friel."

The prosecutor's response to the defense's portrayal of the testimony at trial was not improper because it did not mischaracterize the evidence. Rather the prosecutor was countering the defense's portrayal of the evidence, indicating that there was no testimony that Friel was a "sucker puncher."

## VI.

Finally, Hamilton argues that he was denied the right to a fair trial based on the cumulative error doctrine. We disagree.

"Cumulative error may call for reversal, even if each error standing alone would be considered harmless." Thorgerson, 172 Wn.2d at 454. The doctrine does not apply, however, "where the defendant fails to establish how claimed instances of prosecutorial misconduct affected the outcome of the trial or how combined claimed instances affected the outcome of the trial." Thorgerson, 172 Wn.2d at 454.

Hamilton argues, in the alternative, that he was denied a fair trial because he "presented comprehensive evidence supporting his defense that he struck Friel in self-defense."[5] Hamilton argues that the evidence, coupled with the court's comment about "sucker punches," and the prosecutor's misconduct, in combination prejudiced Hamilton's ability to obtain a fair trial.

---

[5] Hamilton argues in his brief: "Hamilton presented comprehensive evidence supporting his defense that he struck Friel in self-defense. The evidence showed that Friel is known to remove his eyeglasses before fighting, that it was reasonable to interpret Friel's removal of his eyeglasses as a threat on December 11, that Friel fought more when he was drunk, that Friel was drunk that night, that Hamilton reasonably believed Friel was angry at Hamilton, that Hamilton had an injured back to protect, and that Friel had possible backup in his friend Camp, whereas Hamilton came outside alone. Yet the instructions removed self-defense from the jury by injecting the first aggressor instruction."

17

Since none of the alleged misconduct was improper, Hamilton failed to show how the combined effect of the alleged misconduct affected the outcome of the trial.

We affirm.

_Mann, ACJ_

WE CONCUR:

_Smith, J._

_Dwyer, J._