# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 47929-0-II |
| Respondent, | |
| v. | |
| SHANNE THOMAS McKITTRICK, | Consolidated with: |
| Appellant. | |
| STATE OF WASHINGTON, | No. 47953-2-II |
| Respondent, | |
| v. | |
| ERIC MICHAEL ELLISER, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — Shanne Thomas McKittrick and Eric Michael Elliser appeal their convictions for second degree felony murder of Derek Wagner with a deadly weapon sentence enhancement. They argue that the State failed to present sufficient evidence to show that McKittrick committed an assault that resulted in Wagner's death and that Elliser participated in McKittrick's assault of Wagner, and the trial court erred in admitting evidence of skinhead culture in violation of ER 404(b). McKittrick also argues that the trial court erred in giving a primary aggressor jury instruction and sustaining the State's objection to defense counsel's self-defense closing argument.

Elliser also argues that the trial court erred in failing to give a unanimity jury instruction. In a statement of additional grounds (SAG), Elliser contends that the trial court erred in allowing the State's expert to testify about skinhead culture. We affirm.

FACTS

A.    THE CRIME

Derek Wagner, Jeffrey Cooke, Mark Stredicke, Eric Elliser, Shanne McKittrick, and Matthew Wright are or were affiliated with skinhead organizations. Wagner and Cooke were friends.

On November 16, 2013, Wagner went with Cooke to talk to Elliser about the affair that Wagner had with Stredicke's wife, Erin Cochran. After speaking, Wagner and Elliser shook hands, and there did not appear to be any issue between them. Elliser left shortly thereafter.

Later, Wagner, Cooke, and Wright went over to Elliser's house in Cooke's car where they hung out and drank. Elliser; Elliser's girlfriend, Michele McKittrick[1]; McKittrick; McKittrick's girlfriend, Melissa Bourgault; and Danny Harvester were also there. While at Elliser's house, McKittrick had an upsetting phone call with Stredicke. McKittrick was mad that Wagner had slept with Stredicke's wife, that Cooke brought Wagner over, and that Cooke was "hanging out" with Wagner. Verbatim Report of Proceedings VRP) (Mar. 23, 2015) at 26. Cooke tried to explain to McKittrick that Wagner did not know that Cochran was married, but McKittrick was still angry.

---

[1] We use Michele McKittrick's first name because she shares the same last name as one of the defendants. We intend no disrespect.

McKittrick then argued with Wagner about the fact that Wagner had an affair with a "comrade's wife."[2]  VRP (March 18, 2015) at 89.  Michele eventually told everyone to leave.

As everyone was leaving, McKittrick was on the phone with Stredicke again.  McKittrick was still angry, and McKittrick and Cooke were about to fight over Cooke's defense of Wagner.  Cooke threw his knife on the ground because he did not want to be armed in the event they did fight.  Elliser intervened before anything happened.  Wagner then picked up Cooke's knife and Bourgault yelled at him to put it down.  Wagner told Bourgault to "shut up" and called her a vulgar name.  VRP (Mar. 18, 2015) at 121.  McKittrick got upset and was about to fight Wagner when Cooke intervened.

Everyone then went to their cars and left.  Wagner, Cooke, and Wright left in Cooke's car; McKittrick and Bourgault left in Bourgault's car; and Elliser followed separately in his car.  As they were driving, Cooke noticed that McKittrick was following closely behind them with his high beams on and honking.  Wagner told Cooke to pull over because he was ready to fight and not afraid of McKittrick.  They pulled the car over.  Wagner grabbed Cooke's knife from the center console, tucked it into the back of his pants, and got out of the car.  Cooke got out of the car as well.

Outside of the car, Wagner and McKittrick began yelling, rushed towards each other, and started circling one another.  Elliser pulled up, got out, and yelled at Wagner for lying to him.  McKittrick and Elliser were on either side of Wagner, and Elliser tried to grab Wagner.  Cooke went back to the car to grab a bat to stop the confrontation when he heard Wagner call for help

---

[2] "Comrade" is a term skinheads use to refer to fellow skinheads.  VRP (Apr. 14, 2015) at 31.

and McKittrick tell Wagner to put down what was in his hand. Cooke then heard Wagner say that McKittrick stabbed him. Wagner ran off, and McKittrick said that everyone had to go because he "stuck" Wagner. VRP (Mar. 19, 2015) at 19.

The next day, Wagner's body was found in the backyard of a nearby home. Wagner's body had three stab wounds.

B.    THE CHARGES

The State charged McKittrick, by amended information, with first degree premeditated murder and second degree felony murder predicated on assault, alleging he committed the crimes as an accomplice. The State charged Elliser, by amended information, with second degree felony murder predicated on assault and first degree assault, also alleging he committed the crimes as an accomplice.

C.    EXPERT WITNESS AND SKINHEAD EVIDENCE

McKittrick filed a motion to exclude the testimony of the State's gang expert, William Riley, regarding skinhead culture and any evidence that the defendants were skinheads. Riley had worked with the Washington State Department of Corrections for 28 years and was the Department's Security Threat Group Coordinator; he had worked with various groups of investigators related to different gangs, prison and street gangs included. McKittrick argued that Riley was unqualified to give expert testimony and that the testimony was highly prejudicial.

The trial court found that Riley qualified as an expert due to his experience and that the evidence was admissible. However, the trial court specifically excluded "the ideology of the organization . . . as it relates to the purity of the white race and the sanctity of what are referred to as Aryan women." VRP (Feb. 23, 2015) at 151.

4

The trial court revisited this issue during trial. The trial court concluded that the testimony and evidence were admissible. The trial court found that evidence of the high regard for women, the importance of loyalty between skinheads, the need to hold each other accountable for transgressions, the perception of those who did not, and the implications of a fellow skinhead's infidelity with another's wife were relevant and admissible. However, the trial court also found that the socio-political beliefs, beliefs on the sanctity of women, and any mention of Aryan organizations or white supremacists were not relevant and not admissible.

D.     TESTIMONY ON SKINHEAD CULTURE

Cooke testified that as skinheads "you pledge your loyalty and respect and your honor to each other." VRP (Mar. 19, 2015) at 70. A person who commits infidelity is viewed as untrustworthy. If the person that is wronged in such a situation does not do anything about it, they are viewed as weak.

Riley testified that respect is highly regarded within skinhead culture and plays a role in a member's perceived strength and weakness. A member who lacks respect is a negative reflection on the group. As a skinhead, if a member "allow[s] disrespect" to himself, the group mentality is that such person must take care of business and get his respect back; however, if the person is unable to do so for some reason, the group may opt to have another member take care of it. VRP (Apr. 14, 2015) at 25. If a skinhead steps out of line, he may be subject to discipline. Infidelity with another skinhead's wife is considered a major violation and could subject the violating member to "more than just a bare knuckle fight." VRP (Apr. 14, 2015) at 30.

E.     TESTIMONY OF MATTHEW WRIGHT

Wright testified that he, Cooke, and Wagner went to Elliser's house where McKittrick and Bourgault later showed up. Wagner tried to pick a fight with McKittrick after thinking McKittrick was talking about him. As everyone was leaving, Bourgault said something to Wagner and he called her a vulgar name. McKittrick and Wagner then confronted each other, but Cooke broke it up.

Wright then testified that he, Cooke, and Wagner left Elliser's house in Cooke's car. McKittrick followed them and was honking at them, so Wagner told Cooke to pull over so he could "get out and beat his ass, fight him." VRP (Mar. 17, 2015) at 34. After Cooke pulled over, Wagner and McKittrick started fighting outside. Wright later heard McKittrick say that Wagner was trying to grab a knife, but Wright did not see a knife during the fight. Wagner then ran off across the street, was limping, then fell. Wright admitted that he could not see much of the fight because the windows in Cooke's car were tinted and that he never got out of the car.

Wright also testified that Elliser arrived right after this, was angry, and then left to find Wagner. McKittrick then told everyone to go because he had just stabbed Wagner. Wright and Cooke looked for Wagner, could not find him, and went back to Cooke's house. While Wright was there, McKittrick came over to buy a truck from Cooke because he "stabbed [Wagner] bad . . . [he] need[ed] the truck, [and] need[ed] to go." VRP (Mar. 17, 2015) at 74.

6

F.    TESTIMONY OF JEFFREY COOKE

Cooke testified that Wagner wanted to speak with Elliser about sleeping with Cochran. Wagner wanted to explain his side of the story and was ready to fight if it came down to it. Cooke stated that everyone involved in the situation were skinheads and that everything becomes skinhead business.

At Elliser's house, McKittrick was on the phone with Stredicke and began "ranting about [Wagner] being the guy that slept with [Stredicke's] wife." VRP (Mar. 18, 2015) at 86. McKittrick and Wagner then began arguing about Wagner sleeping with a "comrade's wife." VRP (Mar. 18, 2015) at 89. When everyone was leaving, McKittrick and Cooke almost got into a fight over Cooke's defense of Wagner. Cooke threw his knife on the ground in anticipation of a fight, and Wagner picked it up. Bourgault yelled at Wagner to not pick up the knife, and Wagner called her a vulgar name.

Cooke, Wagner, and Wright then left in Cooke's car. After driving for a few minutes, McKittrick and Bourgault appeared behind them with high beams on. They pulled over at Wagner's insistence. Wagner got out of the car. McKittrick and Wagner approached each other, began arguing, and then circled one another. Elliser then pulled up, got out of his car, and yelled at Wagner that he lied to him about the affair.

Elliser and McKittrick were on either side of Wagner and Elliser tried to grab Wagner. When Cooke went back to his car to retrieve a bat, he heard Wagner call for help and McKittrick

tell Wagner to put down what was in his hand. Wagner then ran off yelling that McKittrick had stabbed him. McKittrick said that he stabbed Wagner. Cooke and Wright went to look for Wagner, but they did not find him. While looking for Wagner, Cooke ran into Elliser, who said that "things got out of hand, it wasn't supposed to go like that." VRP (Mar. 19, 2015) at 23.

McKittrick showed up at Cooke's house later that night and said that he had to get out of here. When Cooke asked McKittrick whether he stabbed Wagner with his knife, McKittrick told him that he did not use Cooke's knife. McKittrick said that he got rid of the knife on the bridge before coming over. McKittrick then bought a truck from Cooke.

The next morning, Cooke, McKittrick, Elliser, and Bourgault met at McKittrick's house, and McKittrick tried to make up an alibi. When everyone told him that his alibi did not make sense, he said that he had no choice but to stab Wagner because Wagner pulled a knife on him.

G.    TESTIMONY OF MEDICAL EXAMINER

Dr. Thomas Clark, the Pierce County Medical Examiner, performed Wagner's autopsy. Dr. Clark observed three stab wounds on Wagner's body that were fairly close together. One of the stab wounds was to Wagner's left chest cavity, which incised a rib, caused his left lung to collapse, and caused his heart to bleed into his pericardial space. Another stab wound punctured Wagner's liver and stomach. A third stab wound punctured Wagner's abdomen and caused hemorrhaging under the skin. The wound to the liver and stomach occurred after the wounds to

the chest and abdomen, but it was inconclusive whether the chest wound or the abdomen wound occurred first. The wound to the abdomen would have caused a much slower process of death than the wound to the chest. All three wounds could have caused Wagner's death under the right circumstances, but it was the stab wound to the chest that caused his death, which would have been measured in a small number of minutes. The drop in blood pressure due to the chest wound and the accumulation of blood in the area around the heart would have also been measured in a small number of minutes, but Wagner could have still run for a block after receiving the chest wound.

H.    JURY INSTRUCTIONS

The trial court instructed the jury and gave both a self-defense and primary aggressor instruction. As to self-defense, the court instructed that:

> Homicide is justifiable when committed in the lawful defense of the defendant or any person in the defendant's presence or company when: 1) the defendant reasonably believed that the person slain intended to commit a felony or to inflict death or great personal injury; 2) the defendant reasonably believed that there was imminent danger of such harm being accomplished; and 3) the defendant employed such force and means as a reasonably prudent person would use under the same or similar conditions as they reasonably appeared to the defendant, at the time of the incident taking into consideration all the facts and circumstances as they appeared to him, at the time of and prior to the incident.

Supp. CP (McKittrick) at 360. The trial court also instructed the jury that the State had the burden of proof to disprove self-defense beyond a reasonable doubt. The trial court further instructed the jury:

> No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self[-]defense or defense of another and thereupon kill or use, offer or attempt to use force upon or toward another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense is not available as a defense.

9

Supp. CP (McKittrick) at 366.

I.   CLOSING ARGUMENTS

During McKittrick's closing arguments, defense counsel stated that justifiable homicide required reasonable and imminent belief that the other person intended to commit a felony or inflict death or great personal injury and that the force applied was as much as a reasonably prudent person would in the same conditions as McKittrick. He told the jury that they must "put [themselves] in the shoes of the defendant" considering all the facts and circumstances as they appeared to McKittrick. VRP (Apr. 22, 2015) at 23. The State objected to this argument and the trial court sustained the objection. In response to the State's request to strike, the trial court sustained the objection and stated that the jury's decision was to be based on "their recollection of the evidence and the court's instructions on the law." VRP (Apr. 22, 2015) at 24.

J.   JURY VERDICT

The jury found McKittrick guilty of the lesser included crime of first degree manslaughter and second degree felony murder. The jury found Elliser guilty of first degree assault and second degree felony murder. The jury also found that both defendants were armed with a deadly weapon during the commission of the crimes.

At sentencing, the trial court vacated and dismissed McKittrick's first degree manslaughter conviction and Elliser's first degree assault conviction on double jeopardy grounds. McKittrick and Elliser appeal.[3]

---

[3] We decline to address the issues raised by McKittrick and Elliser regarding their vacated manslaughter and assault convictions, respectively, because those issues are moot. "An issue is moot if it is not possible for this court to provide effective relief." *State v. Deskins*, 180 Wn.2d 68, 80, 322 P.3d 780 (2014). Here, the trial court vacated and dismissed McKittrick's

ANALYSIS

A.    SUFFICIENCY OF THE EVIDENCE

McKittrick argues that the State failed to present sufficient evidence to prove that he committed second degree felony murder predicated on assault.  Elliser argues that the State failed to present sufficient evidence to prove that he was an accomplice to second degree felony murder.

To sustain a conviction, the State must prove all the elements of an offense beyond a reasonable doubt.  *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).  The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt.  *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016).  Circumstantial evidence and direct evidence are equally reliable.  *State v. Farnsworth*, 185 Wn.2d 768, 775, 374 P.3d 1152 (2016).

We review a challenge to the sufficiency of the evidence de novo.  *Rich*, 184 Wn.2d at 903.  A sufficiency challenge admits the truth of the State's evidence.  *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).  All reasonable inferences must be drawn in favor of the State and interpreted strongly against the defendant.  *State v. Wilson*, 141 Wn. App. 597, 608, 171 P.3d 501 (2007).  We defer to the fact finder on issues of conflicting testimony, witness credibility, and the persuasiveness of evidence.  *State v. Ague-Masters*, 138 Wn. App. 86, 102, 156 P.3d 265 (2007).

---

manslaughter conviction and Elliser's assault conviction.  As a result, the issues are moot because we cannot provide effective relief for convictions that do not exist.

1.      McKittrick

McKittrick argues that the State failed to present sufficient evidence to prove that he committed second degree felony murder because it failed to show that he made the stab wound that caused Wagner's death.  We disagree.

Under RCW 9A.32.050(1)(b), a person is guilty of second degree felony murder when he "commits or attempts to commit any felony, including assault, . . . and, in the course of and in furtherance of such crime or in immediate flight therefrom, he or she, or another participant, causes the death of a person other than one of the participants."  A person commits first degree assault when he "[a]ssaults another with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death" or "[a]ssaults another and inflicts great bodily harm" with the intent to inflict "great bodily harm."  RCW 9A.36.011(1)(a), (c).  A person commits second degree assault when he "[i]ntentionally assaults another and thereby recklessly inflicts substantial bodily harm," "[a]ssaults another with a deadly weapon," or "[w]ith intent to commit a felony, assaults another" under circumstances that do not rise to the level of first degree assault.  RCW 9A.36.021(1)(a), (c), (e).

Here, the State presented sufficient evidence to show that McKittrick assaulted Wagner with a deadly weapon and caused Wagner's death.  The evidence showed that Wagner yelled out that McKittrick stabbed him and McKittrick admitted as much.  Wright heard McKittrick say that he had stabbed Wagner.  Cooke testified that McKittrick admitted that he stabbed Wagner and that he got rid of the knife.  Also, the medical evidence showed that Wagner was stabbed three times and any one of the stab wounds could have caused Wagner's death.

12

From this evidence, viewed in the light most favorable to and admitting all reasonable inferences in favor of the State, a rational jury could have found that McKittrick stabbed Wagner, and as a result of McKittrick's assault, Wagner died. Therefore, sufficient evidence was presented to support McKittrick's conviction for second degree felony murder predicated on assault.

2. Elliser

Elliser argues that the State failed to present sufficient evidence to prove that he was an accomplice to second degree felony murder because it failed to show that he knew McKittrick planned to assault Wagner or that he aided, assisted, or encouraged McKittrick. We disagree.

Under RCW 9A.08.020(2)(c), a person is legally accountable for the conduct of another person when he is an accomplice of the other person in the commission of a crime. A person is an accomplice when he "[s]olicits, commands, encourages, or requests such other person to commit" the crime or "[a]ids or agrees to aid such other person in planning or committing it," "with knowledge that it will promote or facilitate the commission of the crime." RCW 9A.08.020(3)(a)(i), (ii). However, mere presence and knowledge of the criminal activity is insufficient to establish accomplice liability. *State v. Truong*, 168 Wn. App. 529, 540, 277 P.3d 74, *review denied*, 175 Wn.2d 1020 (2012). The person must have acted with "knowledge that he or she was promoting or facilitating *the* crime for which that individual was eventually charged." *State v. Moran*, 119 Wn. App. 197, 210, 81 P.3d 122 (2003), *review denied,* 151 Wn.2d 1032 (2004). A person is not guilty as an accomplice unless he "associates himself with the venture and takes some action to help make it successful." *Truong*, 168 Wn. App. at 539.

Here, the State presented evidence that Elliser arrived after Wagner and McKittrick were already circling each other. Elliser was angry at Wagner and yelled that Wagner had lied to him about the affair. Elliser then approached Wagner and McKittrick—standing on the opposite side of McKittrick—and tried to grab Wagner. Shortly thereafter, McKittrick stabbed Wagner, who then ran off. Such evidence showed that Elliser knew he was aiding in McKittrick's assault of Wagner and took action to make it successful. Viewing the evidence in the light most favorable to the State, a rational jury could have found that Elliser knew he was aiding in Wagner's assault, which led to Wagner's death. Therefore, sufficient evidence supports Elliser's conviction as an accomplice to second degree felony murder.

B.     ADMISSION OF EVIDENCE ON SKINHEAD CULTURE

McKittrick and Elliser argue that the trial court erred when it admitted evidence on skinhead culture because it was unnecessary to establish motive and unduly prejudicial. We hold that the trial court did not err.

Under ER 404(b), evidence of "other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Gang evidence falls within the scope of ER 404(b). *State v. Yarbrough*, 151 Wn. App. 66, 81, 210 P.3d 1029 (2009). However, such evidence may be admissible for other purposes, such as proof of motive, intent, or identity. *Id*.

To admit gang evidence under ER 404(b), the trial court must (1) find by a preponderance of evidence that the misconduct occurred, (2) identify the purpose for which the evidence is being introduced, (3) determine that the evidence is relevant to prove an element of the crime charged, and (4) find that its probative value outweighs its prejudicial effect. *State v. Embry*, 171 Wn. App.

14

714, 732, 287 P.3d 648 (2012), *review denied,* 177 Wn.2d 1005 (2013). There must be a nexus between the crime and the gang evidence before the trial court may find the evidence relevant. *State v. Scott*, 151 Wn. App. 520, 526, 213 P.3d 71 (2009), *review denied*, 168 Wn.2d 1004 (2010). And the trial court's balancing of probative value versus prejudicial effect is entitled to great deference. *Degroot v. Berkley Constr.*, Inc., 83 Wn. App. 125, 128, 920 P.2d 619 (1996).

We review a trial court's ER 404(b) rulings for an abuse of discretion. *Embry*, 171 Wn. App. at 731. A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons. *State v. Lord*, 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007). Such is the case when the trial court relies on unsupported facts, takes a view that no reasonable person would take, applies an incorrect legal standard, or bases its ruling on an erroneous legal view. *Id.* at 284.

Here, the trial court admitted evidence of skinhead culture. Cooke testified that as skinheads "you pledge your loyalty and respect and your honor to each other." VRP (Mar. 19, 2015) at 70. Riley also testified that respect is highly regarded within skinhead culture. Infidelity is a significant betrayal of loyalty and is a sign of disrespect. If a member allows himself to be "disrespected," the group mentality is that such person must take care of business and get his respect back; however, if the person is unable to do so for some reason, the group may opt to have another member take care of it. If a skinhead steps out of line, they may be subject to discipline ranging from writing an essay to a fight; infidelity with another skinhead's wife could subject the violating member to more than a fight.

In admitting such evidence, the trial court applied the four-part test and found that (1) the gang affiliation had been stipulated to; (2) the evidence of skinhead culture "contextualizes the events of the evening for the trier of fact, and it shows that that [sic] there is a possible motive for this"; (3) the evidence was relevant to prove motive; and (4) the probative value of showing motive and a violation of group standards outweighed the prejudice resulting from showing gang affiliation. 2 VRP at 147. The trial court stated:

> I do find that probative value to show the reason for the acrimony, perhaps the reason for the upset, the question of loyalty, the question of disrespect may have lent itself, at least to the initial confrontation between the individuals, to be distinguished from what ultimately happened.

VRP (Apr. 14, 2015) at 7. These findings are entitled to great deference. *Degroot*, 83 Wn. App. at 128.

Here, while McKittrick may have been angry at Wagner for calling Bourgault a vulgar name, the evidence shows that McKittrick was angry at Wagner before then because Wagner had slept with a "comrade's wife." VRP (Mar. 18, 2015) at 89. When Wagner left Elliser's house, McKittrick followed Wagner, trailing closely with his high beams on and honking. Thus, the evidence on skinhead culture—adherence to loyalty, high regard for respect, and the need for discipline—was probative to show the reason behind McKittrick's level of acrimony and actions.

And the trial court established parameters for its admission of evidence on skinhead culture. To minimize any prejudice, the trial court precluded any mention of their socio-political beliefs, beliefs on the sanctity of women, and identification as Aryan organizations or white supremacists. The trial court cannot be said to have abused its discretion. Therefore, we hold that the trial court did not err when it admitted evidence of skinhead culture.

16

C.     PRIMARY AGGRESSOR JURY INSTRUCTION AND ARGUMENT ON SELF-DEFENSE

McKittrick argues that the trial court erred when it gave a primary aggressor jury instruction and sustained the State's objection to defense counsel's argument on self-defense because it negated his claim of self-defense. We disagree.

1.     Primary Aggressor Jury Instruction

"[A]n aggressor or one who provokes an altercation" cannot successfully invoke the right to self-defense. *State v. Riley*, 137 Wn.2d 904, 909, 976 P.2d 624 (1999). While not favored, an aggressor instruction is appropriate "'where (1) the jury can reasonably determine from the evidence that the defendant provoked the fight, (2) the evidence conflicts as to whether the defendant's conduct provoked the fight, or (3) the evidence shows that the defendant made the first move by drawing a weapon.'" *State v. Sullivan*, 196 Wn. App. 277, 289, 383 P.3d 574 (2016) (quoting *State v. Stark*, 158 Wn. App. 952, 959, 244 P.3d 433 (2010), *review denied*, 171 Wn.2d 1017 (2011)), *review denied*, 187 Wn.2d 1023 (2017). If a reasonable juror could find from the evidence that the defendant provoked the need to act in self-defense, an aggressor instruction is appropriate. *Id*.

We review de novo whether the state provided sufficient evidence to support a primary aggressor instruction. *Id*. We view the evidence in the light most favorable to the party requesting the instruction. *State v. Wingate*, 155 Wn.2d 817, 823 n.1, 122 P.3d 908 (2005).

Here, the State requested that a primary aggressor instruction be given. At trial, it presented evidence that McKittrick was angry and arguing with Wagner at Elliser's house about Wagner's affair with Cochran and that the argument continued throughout the night. McKittrick and Wagner also confronted each other at Elliser's house after Wagner called Bourgault a vulgar name, but

nothing came from it at the time. At that point, Wagner left with Cooke and McKittrick left in a separate car. But after Wagner left, McKittrick's car appeared behind Cooke's car—which Wagner was riding in—with its headlights on and honking. McKittrick was driving. Wagner then kept insisting that Cooke stop the car, so that Wagner could fight McKittrick, and grabbed Cooke's knife before getting out of the car. After both cars pulled over, McKittrick and Wagner both rushed towards each other.

McKittrick argues that a reasonable jury could conclude that Wagner provoked a fight with McKittrick based on Wagner's actions at Elliser's house—confronting McKittrick after thinking that McKittrick was talking about him—and after leaving Elliser's house—insisting that Cooke pull over, grabbing Cooke's knife before he left the car, and rushing at him. However, the evidence is viewed in the light most favorable to the party requesting the instruction—here, the State. Doing so, a reasonable jury could find that McKittrick provoked the fight based on his own actions at Elliser's house by arguing with Wagner about his sleeping with Cochran; by following Wagner after leaving Elliser's house; by closely following Cooke's car, honking, and having his high beams on; and when they were out of the car, by circling around Wagner.

McKittrick argues that his conduct after leaving Elliser's house did not create the need for Wagner to grab a knife and charge at him, and that his conduct could have been directed at Cooke. Even though primary aggressor instructions are not favored, such an instruction is appropriate when "the jury can reasonably determine from the evidence that the defendant provoked the fight" and when "the evidence conflicts as to whether the defendant's conduct provoked the fight." *Sullivan*, 196 Wn. App. at 289. Both situations exist here to support the trial court's decision to give a primary aggressor instruction. Therefore, the trial court did not err.

2.      Defense Counsel's Argument on Self-Defense

McKittrick challenges the trial court's ruling sustaining the State's objection during closing arguments when his defense counsel argued self-defense, stating that the jury must subjectively put itself in McKittrick's shoes.  We review a trial court's decision to limit closing argument for an abuse of discretion.  *State v. Perez-Cervantes*, 141 Wn.2d 468, 475, 6 P.3d 1160 (2000).  A trial court abuses its discretion only if no reasonable person would adopt the view taken by the trial court.  *State v. Wooten*, 178 Wn.2d 890, 897, 312 P.3d 41 (2013).

The trial court has broad discretion over the scope of closing argument.  *Perez–Cervantes*, 141 Wn.2d at 474-75.  Our Washington Supreme Court has emphasized that the trial court should restrict the argument of counsel to the facts in evidence and the law as set forth in the instructions to the jury.  *State v. Frost*, 160 Wn.2d 765, 772, 161 P.3d 361 (2007), *cert. denied*, 552 U.S. 1145 (2008).

Under the law of self-defense, a homicide is justifiable when the defendant, who was not the aggressor, acted in defense of himself.  RCW 9A.16.050; *Riley*, 137 Wn.2d at 909.  But the jury must find that the defendant reasonably believed that he or she was in danger of imminent harm.  *Riley*, 137 Wn.2d at 909.  And the evidence of self-defense must be assessed from the view of a "reasonably prudent person standing in the shoes of the defendant, knowing all the defendant knows and seeing all the defendant sees."  *Id*.

During closing arguments, while discussing self-defense, defense counsel told the jury that they must "put [themselves] in the shoes of the defendant" considering all the facts and circumstances as they appeared to McKittrick and that it "is not an objective standard this is not,

19

[w]ell, this is what I would have done." VRP (Apr. 22, 2015) at 23-24. The State objected to this argument and the trial court sustained the objection.

Our Supreme Court has clarified that the evidence of self-defense must be assessed from the view of a "reasonably prudent person standing in the shoes of the defendant." *Id*. Thus, while defense counsel may have been correct that the jury must put themselves in McKittrick's shoes, defense counsel was incorrect in arguing that it was a subjective standard. The jury must assess self-defense through the lens of a reasonably prudent person. Thus, the trial court did not abuse its discretion by sustaining an objection to defense counsel's legally erroneous argument.

D.      RIGHT TO A UNANIMOUS JURY VERDICT

Elliser argues that his right to a unanimous jury verdict was violated because the State failed to elect which act it was relying on to prove first degree assault, and the trial court failed to give a unanimity jury instruction. However, we decline to address this issue because it is moot.

"An issue is moot if it is not possible for this court to provide effective relief." *State v. Deskins*, 180 Wn.2d 68, 80, 322 P.3d 780 (2014). In presenting this issue, Elliser requests that his first degree assault conviction be reversed. However, the trial court dismissed Elliser's first degree assault conviction on double jeopardy grounds. Therefore, we cannot provide effective relief for a conviction that does not exist. Because the issue is moot, we decline to address this issue on appeal.

E.      SAG

Elliser argues in a SAG that the trial court erred by allowing Riley to testify.[4]  We disagree.

Under ER 702, "a witness qualified as an expert by knowledge, skill, experience, training, or education," may testify to any specialized knowledge that "will assist the trier of fact to understand the evidence or to determine a fact in issue."  "'Practical experience is sufficient to qualify a witness as an expert.'"  *State v. Weaville,* 162 Wn. App. 801, 824, 256 P.3d 426 (quoting *State v. Ortiz*, 119 Wn.2d 294, 310, 831 P.2d 1060 (1992)), *review denied*, 173 Wn.2d 1004 (2011).

We review the determination of whether a witness is qualified to testify as an expert for an abuse of discretion.  *State v. Holland*, 77 Wn. App. 420, 427, 891 P.2d 49, *review denied*, 127 Wn.2d 1008 (1995).  Such a determination is within the sound discretion of the trial court and its ruling will not be reversed absent a manifest abuse of discretion.  *Id.*

Here, Riley testified to working with the Department of Corrections for 28 years, serving as the Security Threat Group Coordinator, and working with groups of investigators related to different prison and street gangs, skinheads included.  Riley had dealt with skinheads since 1989 and had created a number of presentations and publications on gangs.  The trial court found that Riley's area of expertise fell outside the scope of most lay people, and that his testimony could be of assistance to the trier of fact; thus, he qualified as an expert.  Elliser fails to show that the trial court abused its discretion.  Therefore, we hold that Elliser's SAG claim fails.

---

[4] Elliser also argued in his SAG that Riley's testimony on skinhead culture was inadmissible because it was unduly prejudicial.  This argument is addressed above in Section B.

No. 47929-0-II

APPELLATE COSTS

McKittrick and Elliser request that we decline to impose appellate costs against them if the State substantially prevails on this appeal and makes a proper request. If the State files a request for appellate costs, McKittrick and Elliser may challenge the request before a commissioner of this court under RAP 14.2.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Lee, J.

We concur:

_____
Worswick, J.

_____
Bjorgen, C.J.