IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                              Respondent,<br><br>             v.<br><br>ANTHONY PAUL JOHNSON,<br><br>                              Appellant. | No. 84181-5-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — Anthony Johnson appeals his convictions for assault in the first degree with a deadly weapon and assault in the second degree. He argues that the superior court abused its discretion by categorically refusing to consider both of his motions for standby counsel. We agree that the superior court did not meaningfully consider Johnson's original motion, but conclude that the error was harmless. In a statement of additional grounds, Johnson also asserts that the court improperly provided a "First Aggressor" instruction and a "No Duty to Retreat" instruction and that the convictions were based on insufficient evidence. These claims lack merit. Accordingly, we affirm.[1]

---

[1] On December 18, 2023, Johnson filed a motion to stay these proceedings pending this court's decision on his motion to modify the acting chief judge's order denying Johnson's motion to consolidate his personal restraint petition No. 85640-5-I with his direct appeal. This court denied Johnson's motion to modify on December 19, 2023, so Johnson's motion to stay these proceedings is moot. See State v. Gentry, 125 Wn.2d 570, 616, 888 P.2d 1105 (1995) (a case is moot if the court can no longer provide effective relief).

FACTS

Johnson moved into the Jack Lobdell Apartments in Auburn in 2016. The apartment complex consists of four two-story buildings with exterior stairs and walkways and a gated parking lot with assigned parking slots. Johnson believed his neighbors were maliciously damaging his car, so he would frequently stand in the parking lot admonishing his neighbors to leave his car alone "or I'm going to start messing with your car." Several of Johnson's neighbors testified that they had witnessed this behavior on multiple occasions.

Terrence Morgan lived in a second-floor unit adjacent to the parking lot. Morgan testified that on the afternoon of August 20, 2021, he heard Johnson "screaming more about the ding in his car" and threatening to "fuck everybody up." Morgan and "about seven people" came out of their apartments to see what was going on. Morgan watched as Johnson returned to his apartment, emerged with an object in his hand, and shouted "I'm getting ready to fuck every car up in the parking lot." Morgan was concerned that Johnson might actually try to damage his vehicle, so Morgan said "You're not gonna fuck my car up." Johnson started coming towards Morgan and said "Do you want some of this?" Morgan saw that Johnson had a knife with an eight-to-ten-inch blade in his hand and responded "I'm too old to fight." Johnson immediately sprinted across the parking lot and up the stairs to Morgan's doorstep. Morgan thought Johnson looked "[v]ery angry and enraged . . . like he was coming to do something."

At that point, Morgan decided he "need[ed] to get something to fend [Johnson] off" so he grabbed a "cheap" and "dull" "display sword" from his wall and held it in front of him. The sword was about an inch wide and 30 inches long, including its 12-inch

2

handle. Johnson grabbed the sword blade with his right hand, causing the metal to bend, and said "Now what? Now what?" Johnson then stabbed Morgan four times with the knife in his left hand. Morgan dropped the sword, retreated to his apartment, and asked neighbors to call 911.

Joshua Swogger lived in an adjacent building in the same apartment complex. Swogger testified that he saw Johnson walking away from Morgan's apartment with a knife in his hand and noticed that Morgan was bleeding. Swogger told Johnson "What the fuck are you doing? You just stabbed a man. You're going to jail." Johnson responded, "I mean, yeah, I am going to jail, so I might as well fuck you up too." Swogger realized Johnson was coming after him, so he ran into his apartment and closed the front door while Johnson attempted to push it open from the other side. Swogger "had to use [his] full weight" to push the door closed so he could lock it. Swogger then heard Johnson's car "screech out of the parking lot." Swogger testified that he was afraid that he or his son would have been stabbed if Johnson had managed to get inside.

Benjamin Grantham testified that he witnessed both incidents. Grantham heard Morgan tell Johnson "I'm an old man. I ain't trying to fight nobody." Grantham saw Johnson rush upstairs "like a lightning bolt" and stab Morgan. He then saw Johnson run down and across to Swogger's apartment building with the knife in his hand "fly[ing] up those stairs like I've never seen anybody move in my life." Johnson was "trying to forcibly enter" Swogger's apartment and "trying to slash at them" while Swogger was "trying to shut [the door]." Johnson then "[t]ried to kick the front of people's doors"

3

before getting in his car and driving away. Grantham's 911 call describing the events in real time was played to the jury.

Charles Tiffany lived near Morgan in the Lobdell Apartments and spoke with Morgan almost every day. Tiffany testified that he heard screaming, went outside, and saw Morgan "holding a shirt on his chest" with "a lot of blood." Tiffany then saw Johnson going back upstairs "straight up to [Swogger's] door." After Swogger ran to his apartment and locked the door, Johnson kicked it forcefully, then got in his car and left. Shirley Lidell, who lived downstairs from Morgan, testified that she saw Johnson argue with Morgan and stab Morgan in the shoulder with a large knife. She called 911 and went upstairs to assist Morgan. And Lobdell resident Madrina Contreras testified that she heard Johnson yelling in the parking lot, saw Johnson walking up the stairs with a large knife, and heard something about Morgan being stabbed.

Morgan was airlifted in "full code" to Harborview Medical Center, where he was treated by Dr. Barclay Stewart.[2] Dr. Stewart testified that Morgan suffered three small stab wounds to the upper part of his right chest and one small stab wound to the right upper arm. One of the stab wounds punctured Morgan's lung and created a small pneumothorax that required overnight monitoring.[3] Morgan was not in shock and did not need surgery or stitches. Dr. Stewart testified that on a more probable than not basis Morgan "would have been fine" without medical care but that the wounds could have been life threatening if they had been deeper.

---

[2] Dr. Stewart explained that a patient such as Morgan with torso and junctional penetrating injuries triggers a "full code" trauma activation response, meaning that a team of medical personnel will be in the room waiting when the patient arrives.

[3] Dr. Stewart defined "pneumothorax" as a puncture wound resulting in "air accumulating outside the lungs."

Johnson claimed that he acted in self-defense. He said he was standing in the parking lot complaining about the damage to his car when Morgan came out and said "You're not going to touch my car." Johnson responded "So stop them from touching my car." Morgan responded "I'm too old to fight, okay? But you're not going to touch my car." Johnson said "Well, what are you going to do if I touch your car?" and Morgan said "If you touch my car, I got something for you." Johnson said "What do you got?" and Morgan said "Come up here and I'll show you." Johnson said he thought Morgan was going to give him "some good advice" so he went upstairs. Instead, Morgan reached inside, grabbed his sword, and "went to stick it in [Johnson's] chest." Johnson grabbed the sword, which he described as "sharp," and was cut in the process.[4] Johnson said "[d]o you really want to do this?" and Morgan "didn't say a word" so Johnson took out his pocketknife, "aimed for [Morgan's] shoulder," and walked away. Johnson said Morgan "ambushed" him and he denied having the pocketknife in his hand when he went upstairs to speak to Morgan. Johnson went to his car to wait for police when he heard Swogger shouting at him. Johnson responded "fuck you," chased Swogger up the stairs, and drove away. Johnson denied threatening Swogger with a knife or trying to get into his apartment.

Johnson was arrested the following day after he turned himself in to the Seattle Police Department. The State subsequently charged Johnson by amended information with assault in the first degree with a deadly weapon and assault in the second degree.

At his arraignment on September 16, 2021, Johnson announced that he wanted to represent himself. Johnson then filed a handwritten motion seeking to proceed pro

---

[4] At the time he was arrested, Johnson had "three very small cuts on [his] right upper extremity."

5

se with co-counsel or with standby counsel "to ensure all motions, pleadings, etc. are filed in a timely manner and to interview witnesses and collect evidence outside of my personal ability to do so – due to my status as an in-custody litigant."

At a hearing on October 7, 2021, Johnson's appointed counsel asked the court to consider Johnson's request. Before hearing from Johnson, the trial court responded, "No, this Court will not entertain standby counsel or co-counsel." When counsel attempted to respond, the trial court interjected stating, "[t]hat places attorneys in an untenable position as they have ethical obligations in their practice that, frankly, pro se defendants may not be aware of." While the court engaged in a colloquy with Johnson about proceeding pro se and acknowledged that he earlier represented that he has proceeded pro se in the past, Johnson started to explain "I have, at which time I did get standby counsel. But I guess I'm understanding that that's not going to be – " The court interrupted stating, "It's within the court's discretion, and I don't do that." The court continued its colloquy whereby Johnson confirmed his understanding of what proceeding pro se would entail. The court explained that if Johnson represented himself, the judge is not required to provide him with an attorney as a legal advisor or standby counsel. Johnson objected to this ruling, which the court noted but overruled.

On October 14, 2021, over Johnson's objection, the court continued the omnibus hearing two weeks so the State could provide Johnson with discovery materials. At the October 27, 2021 omnibus hearing, over Johnson's objection, the court found good cause to continue the trial date to November 23, 2021 and reset the speedy trial expiration date to December 23, 2021 so Johnson could get an investigator and time to litigate the State's discovery redactions. At an omnibus hearing on November 9, 2021,

Johnson indicated that he was not ready to proceed to trial as scheduled but nevertheless objected to any further continuance. The court found good cause to continue the trial date to January 13, 2022 so Johnson could be prepared. Johnson's defense investigator was appointed shortly thereafter.

On December 1, 2021, Johnson moved to dismiss for speedy trial violations and because the prosecutor's mismanagement of discovery forced him to have to choose between his speedy trial rights and being prepared to defend himself at trial. On December 17, 2021, the court denied the motion, finding the November 9, 2021 continuance was appropriate under the circumstances and dismissal was not warranted because there was no showing that the State had acted in bad faith. The court denied Johnson's motion for reconsideration.

On January 13, 2022, the court postponed Johnson's trial date to February 14, 2022 due to a surge in Covid-19. Johnson then set another motion for appointment of standby counsel. On February 11, 2022, a hearing took place before a different judge than the one who denied Johnson's previous motion. The judge at this hearing asked Johnson to explain why he wanted standby counsel. Johnson provided three reasons: (1) the State added a deadly weapon enhancement which implicates different variables in sentencing; (2) unlike the first request which was before trial, this request is for during trial in the event there are procedural issues that come up that he may not be aware of; and (3) requiring Johnson to question himself if he testified would not "play too well" for his defense in light of the fact there were implications by a witness in the probable cause statement suggesting Johnson suffered from mental health issues. The trial court asked whether Johnson's previous request for standby counsel had been denied,

7

and Johnson confirmed that it had.  The court then considered and denied Johnson's

motion, reasoning as follows:

> So – and I appreciate the concern about questioning yourself. There are ways to accomplish that.  You know, you're not the first person and, in fact, it's an issue when anyone goes pro se.  And I think there are ways to do that such that if you're worried, for example, about somehow if there's a mental health issue and that you would somehow by participating in that kind of thing play into that.  I think there are ways a trial judge could mitigate any issue about that.  Normally, there may be an instruction that may be appropriate.  Normally, often the judge will let the person testify in a narrative format.  And then of course, you'll be questioned by the prosecutor.  But that will be up to the trial judge.
>
> I can't – you know, standby counsel, we've not generally appointed.  It was something more commonly done 10 years ago, and I think the court's experience wasn't that great.  Frankly, I think I can say that the lawyers who served as standby counsel weren't very happy about doing it.
>
> I don't think what I've heard currently justifies standby counsel based on some of the issues you've raised. It frankly seems, albeit you may have some problems knowing motions, you've been pretty, your pleadings have been appropriate and well done, so.
>
> I can't comment whether you will ultimately – you mentioned something about right to go pro se.  I can't comment on what, if you brought a motion and then you wanted to give up representation, what then would happen, and you have made no interest in doing that.  Sometimes – and it may be a judge – the State may object, and a judge may or may not allow that.  There have been issues – and I'm not saying this is you – where defendants have gone back and forth repeatedly, and it delays the trial.  Most of your motions seem to indicate to me you're eager to go to trial, so I'm not sure that's what would be going on.  But there's a history there in the past of that concern.
>
> So I'm going to deny the motion for standby counsel.  It was denied previously.  I haven't heard a – I think many of the issues you raise could be handled at a trial in an appropriate way short of having standby counsel.

The court's written ruling stated that the motion for standby counsel was denied

because "[a]ppointment of standby counsel is a discretionary ruling by the court at this

stage of the proceedings" and "[t]he defendant has not articulated sufficiently compelling reasons to justify the appointment of standby counsel."

The jury convicted Johnson as charged. Johnson appeals.

DISCUSSION

Standby Counsel

Johnson argues that both trial court judges abused their discretion as a matter of law by categorically refusing to consider Johnson's repeated requests for appointment of standby counsel. A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons. State v. Enstone, 137 Wn.2d 675, 679-80, 974 P.2d 828 (1999).

Criminal defendants have a right to self-representation under both article I, section 22 of the Washington State Constitution and the Sixth Amendment to the United States Constitution. State v. Madsen, 168 Wn.2d 496, 503, 229 P.3d 714 (2010). Although not required under either the state or federal constitutions, a trial court may appoint standby counsel to aid a pro se defendant at the defendant's request. State v. McDonald, 143 Wn.2d 506, 511, 22 P.3d 791 (2001). Our Supreme Court "has defined standby counsel's role as not necessarily representing the defendant but as providing technical information." Id. There is no absolute right of pro se litigants to standby counsel or "hybrid representation" whereby defendants may serve as co-counsel with their attorneys. State v. DeWeese, 117 Wn.2d 369, 379, 816 P.2d 1 (1991).

Johnson acknowledges that pro se defendants are not entitled to standby counsel, but argues that the trial court must exercise its discretion to grant or deny such a request based on the individual circumstances before it. We agree. It is well

9

established that a failure to exercise discretion constitutes an abuse of discretion. See, e.g. State v. Grayson, 154 Wn.2d 333, 342, 111 P.3d 1183 (2005) ("[w]hile no defendant is entitled to an exceptional sentence below the standard range, every defendant is entitled to ask the trial court to consider such a sentence and to have the alternative actually considered."); State v. O'Dell, 183 Wn.2d 680, 697, 358 P.3d 359 (2015) (failure to meaningfully consider youth as a possible mitigating circumstance in sentencing); State v. Stearman, 187 Wn. App. 257, 270, 348 P.3d 394 (2015) (refusal to consider venue motion); State v. Flieger, 91 Wn. App. 236, 242, 955 P.2d 872 (1998) (failure to conduct a hearing regarding restraints on criminal defendant).

Here, in addressing Johnson's second motion for standby counsel, the court meaningfully considered Johnson's circumstances and made an individualized determination. The court noted that appointing standby counsel can be problematic, but did not categorically refuse to consider his request on that basis. Rather, the court considered and addressed the reasons for Johnson's request and ruled that "I don't think what I've heard currently justifies standby counsel based on some of the issues you've raised." The court also noted that Johnson had demonstrated he was capable of raising "appropriate and well done" motions and that Johnson's concerns "could be handled at a trial in an appropriate way short of having standby counsel." Thus, the trial court properly exercised its discretion in denying Johnson's second motion.

The same cannot be said regarding Johnson's original motion for standby counsel. Unlike the second motion, the court that heard Johnson's first request did not meaningfully consider the merits of Johnson's request in light of the specific circumstances of the case. Instead, the court simply stated that it "will not entertain

standby counsel" because doing so places attorneys "in an untenable position." The court denied Johnson's request because, in the court's words, "I don't do that." Although Johnson was not entitled to standby counsel, the court's categorical refusal to exercise its discretion to determine whether standby counsel should be appointed in his case constitutes an abuse of discretion.

The State's reliance on State v. Davis, 6 Wn. App. 2d 43, 429 P.3d 534 (2018), rev'd on other grounds, 195 Wn.2d 571 (2020) does not compel a different outcome. In Davis, the pro se defendant claimed that the trial court abused its discretion by categorically denying his requests for standby counsel. Id. at 52. This court rejected the defendant's claim because the record did not support his argument. Id. at 53. Specifically, the trial court explained that the defendant failed to demonstrate his need for standby counsel overcame the ethical and practical concerns of doing so, and afforded him opportunities to argue that his circumstances had changed since the court denied his original motion. Id. Unlike Davis, the first trial court judge did not meaningfully consider Johnson's request.

Under the nonconstitutional harmless error standard, reversal is required only if there is a reasonable probability that the error materially affected the outcome of the trial. State v. Smith, 106 Wn.2d 772, 780, 725 P.2d 951 (1986). Johnson asserts that the error was not harmless because the appointment of standby counsel would have reduced delay and allowed him to more efficiently and effectively represent himself. But defendants are afforded the right of self-representation "despite the fact that exercising the right will almost surely result in detriment to both the defendant and the administration of justice." State v. Vermillion, 112 Wn. App. 844, 850-51, 51 P.3d 188

(2002). Johnson does not challenge the validity of his waiver of his right to counsel. Nor does he identify any other reason that the outcome of the trial might have been different had standby counsel been appointed. Thus, the error in failing to meaningfully consider Johnson's first request for standby counsel is harmless and reversal is not required.

Statement of Additional Grounds

A. *"First Aggressor" Instruction*

Over Johnson's objection, the court granted the State's request for a "first aggressor" instruction.[5] Johnson contends the instruction was unwarranted. We disagree.

Jury instructions are generally sufficient if "they are supported by substantial evidence, properly state the law, and allow the parties an opportunity to satisfactorily argue their theories of the case." State v. Espinosa, 8 Wn. App. 2d 353, 360-61, 438 P.3d 582 (2019). We review the adequacy of jury instructions de novo. State v. Clausing, 147 Wn.2d 620, 626, 56 P.3d 550 (2002).

"[I]n general, the right of self-defense cannot be successfully invoked by an aggressor or one who provokes an altercation." State v. Riley, 137 Wn.2d 904, 909, 976 P.2d 624 (1999). A first aggressor instruction is proper where there is credible evidence on which a reasonable juror could rely in concluding the defendant was the aggressor. State v. Sullivan, 196 Wn. App. 277, 289, 383 P.3d 574 (2016). Such an

---

[5] The instruction stated: "No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense and thereupon use, offer, or attempt to use force upon or toward another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self defense is not available as a defense. Words alone are not adequate provocation for the defendant to be the aggressor."

instruction is also appropriate "if there is conflicting evidence" as to the identity of the first aggressor. Riley, 137 Wn.2d at 910. We analyze the evidence supporting the instruction in the light most favorable to the party that requested the instruction. State v. Grott, 195 Wn.2d 256, 270, 458 P.3d 750 (2020).

Johnson asserts that credible evidence demonstrates he did not initiate or provoke a confrontation with Morgan and that the instruction prejudiced his theory of self-defense. We disagree. The jury was presented with ample testimony supporting a finding that Johnson's conduct precipitated a fight. The fact that Johnson's testimony conflicted with that of Morgan and other witnesses did not deprive Johnson of his right to have the jury to decide whether or not to accept his self-defense claim. The trial court did not err in giving the first aggressor instruction.

B. "No Duty to Retreat" Instruction

Johnson argues the trial court erred in granting the State's request for a "no duty to retreat" instruction.[6] We disagree.

It is well settled that a person has no duty to retreat when they are assaulted in a place where they have a right to be. State v. Redmond, 150 Wn.2d 489, 493, 78 P.3d 1001 (2003). A "no duty to retreat" instruction is appropriate "where a jury may conclude that flight is a reasonably effective alternative to the use of force in self-defense." State v. Williams, 81 Wn. App. 738, 744, 916 P.2d 445 (1996). A "no duty to retreat" instruction is typically requested by the defendant in support of a theory of self-defense. See 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS:

---

[6] The instruction stated: "It is lawful for a person who is in a place where that person has a right to be and who has reasonable grounds to believe that he is being attacked to stand his ground and defend against such attack by the use of lawful force. The law does not impose a duty to retreat."

CRIMINAL 17.05, at 280 (4th ed. 2016). "The trial court cannot allow the defendant to put forth a theory of self-defense, yet refuse to provide corresponding jury instructions that are supported by the evidence in the case." Redmond, 150 Wn.2d at 495.

Here, as part of his theory of self-defense, Johnson argued that Morgan "did not take any opportunity to avoid any contact with me" and that he "could have went back in, shut the door." The State requested the "no duty to retreat" instruction because it was concerned that "the jury could use Mr. Morgan's testimony about not retreating to prejudice their interpretation of his conduct." The trial court agreed that the instruction was appropriate "given that it really is unfair to leave the jury with a question in their mind as to whether Mr. Morgan should be held to the duty of retreating back into his apartment when he believed that Mr. Johnson had a knife and was coming up to have a physical altercation with him."

Johnson argues that it is highly prejudicial and irregular for the State to propose a jury instruction designed for the defendant and apply it to an alleged victim over the defendant's objection. But Johnson offers no authority for the proposition that it is improper to give this instruction to explain or justify the conduct of an alleged victim versus the conduct of a defendant. We conclude that the instruction was appropriate in light of Johnson's theory that Morgan could have retreated rather than grabbing a sword. Contrary to Johnson's claim, the instruction did not shift the burden of proof or prevent the jury from considering whether Morgan was the first aggressor.

C. *Insufficiency of the Evidence – Assault in the First Degree with a Deadly Weapon*

Johnson also argues that insufficient evidence supported his conviction for assault in the first degree with a deadly weapon. He claims that the evidence fails to

establish that the knife was used in a manner readily capable of causing death or great bodily harm and there was no evidence he intended to cause great bodily harm given that Morgan's injuries were merely superficial. We disagree.

Due process requires the State prove every element of a crime beyond a reasonable doubt. State v. Johnson, 188 Wn.2d 742, 750, 399 P.3d 507 (2017). "To determine whether there is sufficient evidence to support a conviction, we view the evidence in the light most favorable to the prosecution and determine whether any rational fact finder could have found the elements of the crime beyond a reasonable doubt." State v. Marohl, 170 Wn.2d 691, 698, 246 P.3d 177 (2010). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

The court, consistent with RCW 9A.36.011(1)(a), instructed the jury that "[a] person commits the crime of Assault in the First Degree when, with intent to inflict great bodily harm, he or she assaults another with any deadly weapon or by any force or means likely to produce great bodily harm or death."[7] "Great bodily harm" was defined as "bodily injury that creates a probability of death, or which causes significant serious permanent disfigurement, or which causes a significant permanent loss or impairment of the function of any bodily part or organ." See RCW 9A.04.110(4)(c). Intent is present when a person "acts with the objective or purpose to accomplish a result which constitutes a crime." RCW 9A.08.010(1)(a). Specific intent may be inferred "as a

---

[7] Under RCW 9A.36.011(1)(a), "[a] person is guilty of assault in the first degree if he or she, with intent to inflict great bodily harm: . . . [a]ssaults another with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death."

logical probability from all the facts and circumstances." State v. Wilson, 125 Wn.2d 212, 217, 883 P.2d 320 (1994).

Viewed in the light most favorable to the State, it can be inferred from these facts and circumstances that Johnson used the knife in a manner readily capable of causing great bodily harm and acted with specific intent to inflict great bodily harm. The evidence showed that Johnson stabbed Morgan in the chest, puncturing his lung and causing a pneumothorax. See State v. Langford, 67 Wn. App. 572, 587, 837 P.2d 1037 (1992) (stabbing a person in the chest constituted great bodily harm). Morgan was airlifted to Harborview in "full code" due to the nature of his injuries. And Dr. Stewart testified that Morgan's injuries could have been life threatening if the wounds were deeper.

## D. Insufficiency of the Evidence – Assault in the Second Degree

Next, Johnson argues that the State failed to prove beyond a reasonable doubt that he was armed with a deadly weapon during the assault against Swogger.

The court instructed the jury that "[a] person commits the crime of Assault in the Second Degree when he or she assaults another with a deadly weapon." See RCW 9A.36.021(1)(c). And, consistent with RCW 9A.04.110(6), "deadly weapon" was defined as "any weapon, device, instrument, substance, or article, which under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or substantial bodily harm."[8] The instructions further

---

[8] Under RCW 9A.04.110(6), a "deadly weapon" includes any "weapon . . . which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or substantial bodily harm."

stated that a knife having a blade longer than three inches is a deadly weapon, and whether a shorter knife is a deadly weapon is a question of fact for the jury to decide.

Johnson points out that Swogger and Grantham did not see a knife in Johnson's hand while he was coming up the stairs. He also points out that no knife was visible in his hand on a security video that partially captured the event. But Swogger testified that the knife was clearly visible in Johnson's hand while Johnson was walking through the parking lot after stabbing Morgan and confronting Swogger. And Grantham testified that after Johnson stabbed Morgan and ran towards Swogger's apartment, Grantham saw Johnson at the top of the stairs with a knife. Viewed in the light most favorable to the State, the evidence is sufficient to establish that Johnson was armed with a deadly weapon during the assault against Swogger.

*E. Report of Proceedings*

Lastly, Johnson contends that the verbatim report of proceedings before this court "is flawed and incomplete in violation of due process of law and Johnson's State Constitutional right to an appeal." He contends that "a plethora of portions of the transcripts were missing key arguments, discussions and objections and that other portions inaccurately reported what did occur." Johnson asserts that his counsel compared the written transcripts to an audio recording and agreed that there were errors, but counsel nevertheless refused to take any action.

Johnson did not exercise his right to file an objection to the report of proceedings under RAP 9.5(c). And he offers no evidence in support of this claim. To the extent Johnson wishes to raise a claim of ineffective assistance of counsel implicating matters

17

outside the record, the remedy is to bring a personal restraint petition with evidence in support of the claim.  <u>State v. Turner</u>, 167 Wn. App. 871, 881, 275 P.3d 356 (2012).

Affirmed.

_Coburn, J._

WE CONCUR:

_Mann, J._        _Dwyer, J._